**COMMENTARY, FASB, ARB 43: Restatement and Revision of Accounting Research Bulletins, Part 01 of 02**

© 2005, CCH INCORPORATED. All Rights Reserved. A WoltersKluwer Company

**ARB 43: Restatement and Revision of Accounting Research Bulletins**

```
ARB 43 STATUS
```

Issued:  June 1953

Effective Date:  June 1953 (replaced ARBs issued September 1939 -- January
                    1953)

Affects:  No other pronouncements

Affected by: Chapter 1A, paragraph 1 amended by FAS 111, paragraph 8
(a)
              Chapter 1A, paragraph 4 deleted by FAS135, paragraph 4
(a)
              Chapter 1B; Chapter 5, paragraph 7; Chapter 7B, paragraph
                6; Chapter 9C; Chapter 10B; Chapter 12, paragraphs 12 and
                18; and Chapter 15, paragraph 12 amended by APB 6,
                paragraphs 13, 15, 16, 23, 23, 18, and 19, respectively
              Chapter 1B, paragraph 7 amended by APB 6, paragraph 12; APB
                16, paragraph 7; and FAS 135, paragraph 4
(b)
              Chapter 2A, paragraph 3 amended by APB 20, paragraph 5
(a), and
                FAS 154, paragraph C2
              Chapter 2B and Chapter 8 deleted by APB 9, paragraph 2
              Chapter 3A, paragraph 4
(f) amended by FAS 115, paragraph 125
              Chapter 3A, paragraph 6
(g) amended by APB 21, paragraph 5,
                and FAS 111, paragraph 8
(a)
              Chapter 3A, paragraph 7 amended by FAS 78, paragraph 5
              Chapter 3A, paragraph 8 amended by FAS 6, paragraph 16
              Chapter 3A, paragraph 9 amended by FAS 135, paragraph 4
(a)
              Chapter 3A, paragraph 10 added by APB 6, paragraph 14
              Chapter 3A, footnote 4 deleted by FAS 6, paragraph 16
              Chapter 3B replaced by APB 10, paragraph 7
              Chapter 4, paragraph 5 and footnote 2 amended by FAS 151,
                paragraph 2
              Chapter 4, paragraph 5A added by FAS 151, paragraph 2
              Chapter 4, paragraph 8 amended by FAS 133, paragraph 526
              Chapter 5, paragraphs 1 through 9 deleted prospectively by
                APB 17, paragraph 8
              Chapter 5, paragraphs 5, 6, 8, and 9, and footnote 1; Chapter
                10B, paragraphs 15 and 17; Chapter 12, paragraph 21; and
                Chapter 15, paragraphs 7 and 17 amended by APB 9,
                paragraph 2
              Chapter 5, paragraphs 8 and 10 amended by FAS 44, paragraphs
                3 and 4
              Chapter 5, paragraph 10 deleted prospectively by APB 16,
                paragraph 7
              Chapter 5 deleted by FAS 142, paragraph D1
```

Chapter 6 deleted by FAS 5, paragraph 7
Chapter 7A, paragraph 10 amended by FAS 111, paragraph 8
(a)

Chapter 7C deleted by ARB 48
Chapter 9B replaced by APB 6, paragraph 17
Chapter 9C, paragraph 5 amended by FAS 96, paragraph 205
(a),
    and FAS 109, paragraph 288
(a)

Chapter 9C, paragraphs 11 through 13 amended by APB 11,
    paragraph 2
(a)

Chapter 9C, paragraphs 11 through 13 replaced by FAS 96,
    paragraph 205(a), and FAS 109, paragraph 288
(a)

Chapter 10A, paragraph 19 amended by APB 9, paragraph 2, and
    FAS 111, paragraph 8
(a)

Chapter 10B deleted by APB 11, paragraph 1
(a), and FAS 109,
    paragraph 288
(a)

Chapter 11B, paragraph 8 amended by APB 11, paragraph 2
(b)

Chapter 11B, paragraph 8 deleted by FAS 96, paragraph 205
(a),
    and FAS 109, paragraph 288
(a)

Chapter 11B, paragraph 9 amended by APB 9, paragraph 2, and
    FAS 111, paragraph 8
(a)

Chapter 11B, footnotes 3 and 4 amended by APB 9, paragraph 2

Chapter 11B, footnotes 3 and 4 deleted by FAS 111, paragraph
    8
(a)

Chapter 12, paragraph 5 amended by FAS 8, paragraph 4; FAS
    52, paragraph 3, footnote 1; and FAS 131, paragraph 129
(a)

Chapter 12, paragraph 6 replaced by FAS 131, paragraph 129
(b)

Chapter 12, paragraphs 7 and 10 through 22 deleted by FAS 8,
    paragraph 4, and FAS 52, paragraph 3, footnote 1
Chapter 12, paragraphs 8 and 9 deleted by FAS 94, paragraph
    16
Chapter 13A deleted by APB 8, paragraph 6
Chapter 13B, paragraph 2 amended by FAS 123, paragraph 381
(a)

Chapter 13B, paragraphs 6 through 13 and footnotes 2 and 3
    deleted by APB 25, paragraph 4
Chapter 13B, paragraph 14 amended by APB 25, paragraph 4
Chapter 13B, paragraph 15 deleted by FAS 123, paragraph
    381
(b)

Chapter 13B, deleted by FAS 123
(R), paragraph D10
Chapter 14 deleted by APB 5, paragraph 1
Chapter 15, paragraph 11 amended by APB 11, paragraph 2
(c)

Chapter 15, paragraph 11 deleted by FAS 96, paragraph 205 (a)

Chapter 15 deleted by APB 26, paragraph 2

Other Interpretive Pronouncements:  AIN-ARB 43, Chapter 13B, Interpretation

No. 1 (Superseded by APB 25)

FTB 85-1

FTB 85-6

AICPA Accounting Standards Executive Committee (AcSEC)

Related Pronouncements: Chapter 1A, SOP 76-3, SOP 93-6, PB 14

Chapter 1B, SOP 76-3, SOP 93-6, PB 14

Chapter 3A, SOP 90-7

Chapter 4, SOP 85-3, SOP 94-6, PB 2

Chapter 7A, SOP 90-7

Chapter 9C, SOP 85-3, SOP 88-1

Issues Discussed by FASB Emerging Issues Task Force (EITF)

Affects:  No EITF Issues

Interpreted by:  Chapter 3A, paragraph 7 interpreted by EITF Issues No. 86-5 and 86-30

Related Issues:  Chapter 1A  -- EITF Issues No. 85-1 and 97-14

Chapter 2A  -- EITF Topic No. D-85

Chapter 3A  -- EITF Issue No. 95-22

Chapter 4  -- EITF Issues No. 84-10, 84-24, 86-46,

96-9, 01-9, and 04-6

Chapter 7B  -- EITF Topic No. D-82

**Preface**

Since its organization the American Institute of Accountants, aware of divergences in accounting procedures and of an increasing interest by the public in financial reporting, has given consideration to problems raised by these divergences. Its studies led it, in 1933, to make certain recommendations to the New York Stock Exchange which were adopted by the Institute in 1934. Further consideration developed into a program of research and the publication of opinions, beginning in 1938, in a series of Accounting Research Bulletins.

Forty-

two bulletins were issued during the period from 1939 to 1953.
   Eight of these were reports of the committee on terminology. The other
34 were the result of research by the committee on accounting procedure
directed to those segments of accounting practice where problems were
most demanding and with which business and the accounting profession
were most concerned at the time.

   Some of these studies were undertaken to meet new business or economic
developments. Some arose out of the war which ended in 1945 and the
problems following in its wake. Certain of the bulletins were amended,
superseded, or withdrawn as changing conditions affected their
usefulness.

   The purposes of this restatement are to eliminate what is no longer
applicable, to condense and clarify what continues to be of value, to
revise where changed views require revision, and to arrange the retained
material by subjects rather than in the order of issuance. The
terminology bulletins are not included. They are being published
separately.

   The committee has made some changes of substance, which are summarized
in Appendix B.

   The several chapters and subchapters of this restatement and revision
are to be regarded as a cancellation and replacement of Accounting
Research Bulletins 1 through 42, excepting the terminology bulletins
included in that series, which are being replaced by a separate
publication.

   Although the committee has approved the objective of finding a better
term than the word *surplus* for use in published financial statements,
it has used surplus herein as being a technical term well understood
among accountants, to whom its pronouncements are primarily directed.

   *Committee on Accounting Procedure    June, 1953*

Assent

   *Each section of Accounting Research Bulletin No. 43, entitled*
Restatement and Revision of Accounting Research Bulletins, *was
separately adopted by the assenting votes of the twenty members of the
committee except to the extent that dissents, or assents with
qualification, are noted at the close of each section. Publication of
the bulletin as a whole was approved by the assenting votes of all
members of the committee, one of whom, Mr. Andrews, assented with
qualification.*

   Mr. Andrews assents to the publication of this bulletin only to the
extent that it constitutes, with no changes in meaning other than those
set forth in Appendix B, a restatement of the bulletins previously
issued by the committee and not mentioned in appendix C as having been
omitted. He dissents from the statement contained in the preface that
this bulletin is to be regarded as a cancellation of the previously
issued bulletins; he regards it as beyond the power of the committee to
cancel its previous statements, which in his view inescapably remain
authoritative expressions as at the date of their utterance.

Board Members

**Committee on Accounting Procedure (1952-**

**1953)**

| | | |
|---|---|---|
| Paul K. Knight, *Chairman* | Perry Mason | William W. Werntz |
| Frederick B. Andrews | Edward F. McCormack | Edward B. Wilcox |
| Frank S. Calkins | John Peoples | Raymond D. Willard |
| H. A. Finney | Maurice E. Peloubet | Robert W. Williams |
| Roy Godfrey | John W. Queenan | Karl R. Zimmermann |
| Thomas G. Higgins | Walter L. Schaffer | _____ |
| John A. Lindquist | C. Aubrey Smith | Carman G. Blough, *Director of Research* |
| | C. Oliver Wellington | |

## INTRODUCTION

### Accounting and the Corporate System

1. Accounting is essential to the effective functioning of any business organization, particularly the corporate form. The test of the corporate system and of the special phase of it represented by corporate accounting ultimately lies in the results which are produced. These results must be judged from the standpoint of society as a whole -- not merely from that of any one group of interested persons.

2. The uses to which the corporate system is put and the controls to which it is subject change from time to time, and all parts of the machinery must be adapted to meet changes as they occur. In the past fifty years there has been an increasing use of the corporate system for the purpose of converting into readily transferable form the ownership of large, complex, and more or less permanent business enterprises. This evolution has brought in its train certain uses of the processes of law and accounting which have led to the creation of new controls, revisions of the laws, and reconsideration of accounting procedures.

3. As a result of this development, the problems in the field of accounting have increasingly come to be considered from the standpoint of the buyer or seller of an interest in an enterprise, with consequent increased recognition of the significance of the income statement and a tendency to restrict narrowly charges and credits to surplus. The fairest possible presentation of periodic net income, with neither material overstatement nor understatement, is important, since the results of operations are significant not only to prospective buyers of an interest in the enterprise but also to prospective sellers. With the increasing importance of the income statement there has been a tendency to regard the balance sheet as the connecting link between successive income statements; however this concept should not obscure the fact that the balance sheet has significant uses of its own.

4. This evolution has also led to a demand for a larger degree of uniformity in accounting. *Uniformity* has usually connoted similar treatment of the same item occurring in many cases, in which sense it runs the risk of concealing important differences among cases. Another sense of the word would require that different authorities working independently on the same case should reach the same conclusions. Although uniformity is a worthwhile goal, it should not be pursued to the exclusion of

other benefits. Changes of emphasis and objective as well as
changes in conditions under which business operates have led, and
doubtless will continue to lead, to the adoption of new
accounting procedures. Consequently diversity of practice may
continue as new practices are adopted before old ones are
completely discarded.

**Applicability of Committee Opinions**

5. The principal objective of the committee has been to narrow
areas of difference and inconsistency in accounting practices,
and to further the development and recognition of generally
accepted accounting principles, through the issuance of opinions
and recommendations that would serve as criteria for determining
the suitability of accounting practices reflected in financial
statements and representations of commercial and industrial
companies. In this endeavor, the committee has considered the
interpretation and application of such principles as appeared to
it to be pertinent to particular accounting problems. The
committee has not directed its attention to accounting problems
or procedures of religious, charitable, scientific, educational,
and similar non-
profit institutions, municipalities, professional
firms, and the like. Accordingly, except where there is a
specific statement of a different intent by the committee, its
opinions and recommendations are directed primarily to business
enterprises organized for profit.

**Voting Procedure in Adopting Opinions**

6. The committee regards the representative character and
general acceptability of its opinions as of the highest
importance, and to that end has adopted the following procedures:

    a. Any opinion or recommendation before issuance is
       submitted in final form to all members of the committee
       either at a meeting or by mail.

    b. No such opinion or recommendation is issued unless it
       has received the approval of two-
thirds of the entire
       committee.

    c. Any member of the committee dissenting from an opinion
       or recommendation issued under the preceding rule is
       entitled to have the fact of his dissent and his reasons
       therefore recorded in the document in which the opinion
       or recommendation is presented.

7. Before reaching its conclusions, the committee gives careful
consideration to prior opinions, to prevailing practices, and to
the views of professional and other bodies concerned with
accounting procedures.

**Authority of Opinions**

8. Except in cases in which formal adoption by the Institute
membership has been asked and secured, the authority of opinions
reached by the committee rests upon their general acceptability.
The committee recognizes that in extraordinary cases fair

presentation and justice to all parties at interest may require exceptional treatment. But the burden of justifying departure from accepted procedures, to the extent that they are evidenced in committee opinions, must be assumed by those who adopt another treatment.

9. The committee contemplates that its opinions will have application only to items material and significant in the relative circumstances. It considers that items of little or no consequence may be dealt with as expediency may suggest. However, freedom to deal expediently with immaterial items should not extend to a group of items whose cumulative effect in any one financial statement may be material and significant.

**Opinions not Retroactive**

10. No opinion issued by the committee is intended to have a retroactive effect unless it contains a statement of such intention. Thus an opinion will ordinarily have no application to a transaction arising prior to its publication, nor to transactions in process of completion at the time of publication. But while the committee considers it inequitable to make its statements retroactive, it does not wish to discourage the revision of past accounts in an individual case if it appears to be desirable in the circumstances.

**The Company and Its Auditors**

11. Underlying all committee opinions is the fact that the accounts of a company are primarily the responsibility of management. The responsibility of the auditor is to express his opinion concerning the financial statements and to state clearly such explanations, amplifications, disagreement, or disapproval as he deems appropriate. While opinions of the committee are addressed particularly to certified public accountants whose problem it is to decide what they may properly report, the committee recommends similar application of the procedures mentioned herein by those who prepare the accounts and financial statements.

**Chapter 1: PRIOR OPINIONS**

Section A  --
Rules Adopted by Membership

   Below are reprinted the six rules adopted by the membership of the Institute in 1934, the first five of which had been recommended in 1933 to the New York Stock Exchange by the Institute's committee on cooperation with stock exchanges.

1. Unrealized profit should not be credited to income account of the corporation either directly or indirectly, through the medium of charging against such unrealized profits amounts which would ordinarily fall to be charged against income account. Profit is deemed to be realized when a sale in the ordinary course of business is effected, unless the circumstances are such that the collection of the sale price is not reasonably assured. An exception to the general rule may be made in respect of inventories in industries (such as packing-

house industry) in
which owing to the impossibility of determining costs it is a
trade custom to take inventories at net selling prices, which may
exceed cost.

2. Capital surplus, however created, should not be used to
relieve the income account of the current or future years of
charges which would otherwise fall to be made thereagainst. This
rule might be subject to the exception that where, upon
reorganization, a reorganized company would be relieved of
charges which would require to be made against income if the
existing corporation were continued, it might be regarded as
permissible to accomplish the same result without reorganization
provided the facts were as fully revealed to and the action as
formally approved by the shareholders as in reorganization.

3. Earned surplus of a subsidiary company created prior to
acquisition does not form a part of the consolidated earned
surplus of the parent company and subsidiaries; nor can any
dividend declared out of such surplus properly be credited to the
income account of the parent company.

4. While it is perhaps in some circumstances permissible to show
stock of a corporation held in its own treasury as an asset, if
adequately disclosed, the dividends on stock so held should not
be treated as a credit to the income account of the company.

5. Notes or accounts receivable due from officers, employees, or
affiliated companies must be shown separately and not included
under a general heading such as notes receivable or accounts
receivable.

6. If capital stock is issued nominally for the acquisition of
property and it appears that at about the same time, and pursuant
to a previous agreement or understanding, some portion of the
stock so issued is donated to the corporation, it is not
permissible to treat the par value of the stock nominally issued
for the property as the cost of that property. If stock so
donated is subsequently sold, it is not permissible to treat the
proceeds as a credit to surplus of the corporation.

**Section B  --**
**Opinion Issued by Predecessor Committee**

1. Following an inquiry made by the New York Stock Exchange, a
predecessor committee on accounting procedure in 1938 issued the
following report:

**"Profits or Losses on Treasury Stock"**

2. "The executive committee of the American Institute of
Accountants has directed that the following report of the
committee on accounting procedure, which it received at a meeting
on April 8, 1938, be published, without approval or disapproval
of the committee, for the information of members of the
Institute:

To the Executive Committee,
American Institute of Accountants:

3. "This committee has had under consideration the question regarding treatment of purchase and sale by a corporation of its own stock, which was raised during 1937 by the New York Stock Exchange with the Institute's special committee on cooperation with stock exchanges.

4. "As a result of discussions which then took place, the special committee on cooperation with stock exchanges made a report which was approved by the committee on accounting procedure and the executive committee, and a copy of which was furnished to the committee on stock list of the New York Stock Exchange. The question raised was stated in the following form:

5. "`Should the difference between the purchase and resale prices of a corporation's own common stock be reflected in earned surplus (either directly or through inclusion in the income account) or should such difference be reflected in capital surplus?'

6. "The opinion of the special committee on cooperation with stock exchanges reads in part as follows:

7. "`Apparently there is general agreement that the difference between the purchase price and the stated value of a corporation's common stock purchased and retired should be reflected in capital surplus. Your committee believes that while the net asset value of the shares of common stock outstanding in the hands of the public may be increased or decreased by such purchase and retirement, such transactions relate to the capital of the corporation and do not give rise to corporate profits or losses. Your committee can see no essential difference between (a) the purchase and retirement of a corporation's own common stock and the subsequent issue of common shares, and (b) the purchase and resale of its own common stock.'

8. "This committee is in agreement with the views thus expressed; it is aware that such transactions have been held to give rise to taxable income, but it does not feel that such decisions constitute any bar to the application of correct accounting procedure as above outlined.

9. "The special committee on cooperation with stock exchanges continued and concluded its report with the following statement:

10. "`Accordingly, although your committee recognizes that there may be cases where the transactions involved are so inconsequential as to be immaterial, it does not believe that, as a broad general principle, such transactions should be reflected in earned surplus (either directly or through inclusion in the income account).'

11. "This committee agrees with the special committee on cooperation with stock exchanges, but thinks it desirable to point out that the qualification should not be applied to any transaction which, although in itself inconsiderable in amount, is a part of a series of transactions which in the aggregate are of substantial importance."

12. "This committee recommends that the views expressed be circulated for the information of members of the Institute."

**Chapter 2: FORM OF STATEMENTS**

**Section A --**
**Comparative Financial Statements**

1. The presentation of comparative financial statements in annual and other reports enhances the usefulness of such reports and brings out more clearly the nature and trends of current changes affecting the enterprise. Such presentation emphasizes the fact that statements for a series of periods are far more significant than those for a single period and that the accounts for one period are but an instalment of what is essentially a continuous history.

2. In any one year it is ordinarily desirable that the balance sheet, the income statement, and the surplus statement be given for one or more preceding years as well as for the current year. Footnotes, explanations, and accountants' qualifications which appeared on the statements for the preceding years should be repeated, or at least referred to, in the comparative statements to the extent that they continue to be of significance. If, because of reclassifications or for other reasons, changes have occurred in the manner of or basis for presenting corresponding items for two or more periods, information should be furnished which will explain the change. This procedure is in conformity with the well recognized principle that any change in practice which affects comparability should be disclosed.

3. It is necessary that prior-year figures shown for comparative purposes be in fact comparable with those shown for the most recent period, or that any exceptions to comparability be clearly brought out.

4. Circumstances vary so greatly that it is not practicable to deal here specifically with all situations. The independent accountant should, however, make very clear what statements are included within the scope of his report.

**Section B --**
**Combined Statement of Income and Earned Surplus**

1. Attention has already been called in the introduction to the increased significance attributed to the income statement by users of financial statements and to the general tendency to regard the balance sheet as the connecting link between successive income statements. It therefore becomes important to consider the problems presented by the practice of combining the annual income statement with the statement of earned surplus.

2. The combining of these two statements, where possible, will often be found to be convenient and desirable. Where this presentation is contemplated, however, certain considerations should be borne in mind if undesirable consequences are to be avoided.

**Advantages of the Combined Statement**

3. Over the years it is plainly desirable that all costs,

expenses, and losses, and all profits of a business, other than
decreases or increases arising directly from its capital-
stock
transactions, be included in the determination of income. If this
principle could in practice be carried out perfectly, there would
be no charges or credits to earned surplus except those relating
to distributions and appropriations of final net income. This is
an ideal upon which all may agree, but because of conditions
impossible to foresee it often fails of attainment. From time to
time charges and credits are made to surplus which clearly affect
the cumulative total of income for a series of years, although
their exclusion from the income statement of a single year is
justifiable. There is danger that unless the two statements are
closely connected such items will be overlooked, or at any rate
not given full weight, in any attempt on the part of the reader
to compute a company's long-run income or its income-
earning
capacity.

4. There is a marked tendency to exaggerate the significance of
the net income for a single year, particularly the degree to
which the net income can be identified exclusively with that
year. In so far as the combined form calls attention to the
character of the income statement as a tentative instalment in
the long-
time financial results it serves a useful purpose.

5. To summarize, the combined income and earned surplus
statement serves the purpose of showing in one statement both the
earnings applicable to the particular period and modifications of
earned surplus on a long-
run basis. It distinguishes current
charges and credits related to a company's more usual or typical
business operations from material extraordinary charges and
credits
[fn1] which may have arisen during the period by placing them
in different sections of a continuous statement.

[fn1] See chapter 8, paragraphs 11, 12, and 13.

**Disadvantages and Limitations**

6. In the combined statement, net income for the year appears
somewhere within the statement and not at the end. Such wording
and arrangement should be used as will make this item
unmistakably clear and leave the reader in no doubt as to the
point at which the net income has been determined.

7. While it is true that the net income amount, when expressed
as earnings per share, is often given undue prominence and its
significant exaggerated, there nevertheless remain the
responsibility for determination of net income by sound methods
and the duty to show it clearly. The adoption of the combined
statement provides no excuse for less care in distinguishing
charges and credits to income from charges and credits to surplus
than would be required if separate statements of income and
surplus were presented. Failure to exercise care in the use of
this form of statement would immediately discredit it.

**Chapter 3: WORKING CAPITAL**

**Section A --**
**Current Assets and Current Liabilities**

1. The working capital of a borrower has always been of prime interest to grantors of credit; and bond indentures, credit agreements, and preferred stock agreements commonly contain provisions restricting corporate actions which would effect a reduction or impairment of working capital. Many such contracts forego precise or uniform definitions and merely provide that current assets and current liabilities shall be determined in accordance with generally accepted accounting principles. Considerable variation and inconsistency exist, however, with respect to their classification and display in financial statements. In this section the committee discusses the nature of current assets and current liabilities with a view toward a more useful presentation thereof in financial statements.

2. The committee believes that, in the past, definitions of current assets have tended to be overly concerned with whether the assets may be immediately realizable. The discussion which follows takes cognizance of the tendency for creditors to rely more upon the ability of debtors to pay their obligations out of the proceeds of current operations and less upon the debtor's ability to pay in case of liquidation. It should be emphasized that financial statements of a going concern are prepared on the assumption that the company will continue in business. Accordingly, the views expressed in this section represent a departure from any narrow definition or strict one year interpretation of either current assets or current liabilities; the objective is to relate the criteria developed to the operating cycle of a business.

3. Financial position, as it is reflected by the records and accounts from which the statement is prepared, is revealed in a presentation of the assets and liabilities of the enterprise. In the statements of manufacturing, trading, and service enterprises these assets and liabilities are generally classified and segregated; if they are classified logically, summations or totals of the *current* or *circulating* or *working* assets, hereinafter referred to as *current assets*, and of obligations currently payable, designated as *current liabilities*, will permit the ready determination of working capital. *Working capital*, sometimes called *net working capital*, is represented by the excess of current assets over current liabilities and identifies the relatively liquid portion of total enterprise capital which constitutes a margin or buffer for meeting obligations within the ordinary operating cycle of the business. If the conventions of accounting relative to the identification and presentation of current assets and current liabilities are made logical and consistent, the amounts, bases of valuations, and composition of such assets and liabilities and their relation to the total assets or capital employed will provide valuable data for credit and management purposes and afford a sound basis for comparisons from year to year. It is recognized that there may be exceptions, in special cases, to certain of the inclusions and exclusions as set forth in this section. When such exceptions occur they should be accorded the treatment merited in the particular circumstances under the general principles outlined herein.

4. For accounting purposes, the term *current assets* is used to designate cash and other assets or resources commonly identified as those which are reasonably expected to be realized in cash or sold or consumed during the normal operating cycle of the business. Thus the term comprehends in general such resources as (a) cash available for current operations and items which are the equivalent of cash; (b) inventories of merchandise, raw materials, goods in process, finished goods, operating supplies, and ordinary maintenance material and parts; (c) trade accounts, notes, and acceptances receivable; (d) receivables from officers, employees, affiliates, and others, if collectible in the ordinary course of business within a year; (e) instalment or deferred accounts and notes receivable if they conform generally to normal trade practices and terms within the business; (f) marketable securities representing the investment of cash available for current operations; and (g) prepaid expenses such as insurance, interest, rents, taxes, unused royalties, current paid advertising service not yet received, and operating supplies. Prepaid expenses are not current assets in the sense that they will be converted into cash but in the sense that, if not paid in advance, they would require the use of current assets during the operating cycle.

5. The ordinary operations of a business involve a circulation of capital within the current asset group. Cash is expended for materials, finished parts, operating supplies, labor, and other factory services, and such expenditures are accumulated as inventory cost. Inventory costs, upon sale of the products to which such costs attach, are converted into trade receivables and ultimately into cash again. The average time intervening between the acquisition of materials or services entering this process and the final cash realization constitutes an *operating cycle*. A one-year time period is to be used as a basis for the segregation of current assets in cases where there are several operating cycles occurring within a year. However, where the period of the operating cycle is more than twelve months, as in, for instance, the tobacco, distillery, and lumber businesses, the longer period should be used. Where a particular business has no clearly defined operating cycle, the one-year rule should govern.

6. This concept of the nature of current assets contemplates the exclusion from that classification of such resources as: (a) cash and claims to cash which are restricted as to withdrawal or use for other than current operations, are designated for expenditure in the acquisition or construction of noncurrent assets, or are segregated[fn1] for the liquidation of long-term debts; (b) investments in securities (whether marketable or not) or advances which have been made for the purposes of control, affiliation, or other continuing business advantage; (c) receivables arising from unusual transactions (such as the sale of capital assets, or loans or advances to affiliates, officers, or employees) which are not expected to be collected within twelve months; (d) cash surrender value of life insurance policies; (e) land and other natural resources; (f) depreciable assets; and (g) long-

term
  prepayments which are fairly chargeable to the operations of
  several years, or deferred charges such as unamortized debt
  discount and expense, bonus payments under a long-
term lease,
  costs of rearrangement of factory layout or removal to a new
  location, and certain types of research and development costs.

  [fn1] Even though not actually set
  aside in special accounts, funds that are clearly to be
  used in the near future for the liquidation of long-
term
  debts, payments to sinking funds, or for similar
  purposes should also, under this concept, be excluded
  from current assets. However, where such funds are
  considered to offset maturing debt which has properly
  been set up as a current liability, they may be included
  within the current asset classification.

  7. The term *current liabilities* is used principally to
  designate obligations whose liquidation is reasonably expected to
  require the use of existing resources properly classifiable as
  current assets, or the creation of other current liabilities. As
  a balance-
sheet category, the classification is intended to
  include obligations for items which have entered into the
  operating cycle, such as payables incurred in the acquisition of
  materials and supplies to be used in the production of goods or
  in providing services to be offered for sale; collections
  received in advance of the delivery of goods or performance of
  services
[fn2]; and debts which arise from operations directly
  related to the operating cycle, such as accruals for wages,
  salaries, commissions, rentals, royalties, and income and other
  taxes. Other liabilities whose regular and ordinary liquidation
  is expected to occur within a relatively short period of time,
  usually twelve months, are also intended for inclusion, such as
  short-
term debts arising from the acquisition of capital assets,
  serial maturities of long-
term obligations, amounts required to
  be expended within one year under sinking fund provisions, and
  agency obligations arising from the collection or acceptance of
  cash or other assets for the account of third persons.
[fn3]

  [fn2] Examples of such current
  liabilities are obligations resulting from advance
  collections on ticket sales, which will normally be
  liquidated in the ordinary course of business by the
  delivery of services. On the contrary, obligations
  representing long-
term deferments of the delivery of
  goods or services would not be shown as current
  liabilities. Examples of the latter are the issuance of
  a long-
term warranty or the advance receipt by a lessor
  of rental for the final period of a ten-
year lease as a
  condition to execution of the lease agreement.

[fn3] Loans accompanied by pledge of
life insurance policies would be classified as current
liabilities when, by their terms or by intent, they are
to be repaid within twelve months. The pledging of life
insurance policies does not affect the classification of
the asset any more than does the pledging of
receivables, inventories, real estate, or other assets
as collateral for a short-
term loan. However, when a
loan on a life insurance policy is obtained from the
insurance company with the intent that it will not be
paid but will be liquidated by deduction from the
proceeds of the policy upon maturity or cancellation,
the obligation should be excluded from current
liabilities.

8. This concept of current liabilities would include estimated
or accrued amounts which are expected to be required to cover
expenditures within the year for known obligations (a) the amount
of which can be determined only approximately (as in the case of
provisions for accruing bonus payments) or (b) where the specific
person or persons to whom payment will be made cannot as yet be
designated (as in the case of estimated costs to be incurred in
connection with guaranteed servicing or repair of products
already sold). The current liability classification, however, is
not intended to include a contractual obligation falling due at
an early date which is expected to be refunded,
[fn4] or debts
to be liquidated by funds which have been accumulated in accounts
of a type not properly classified as current assets, or long-
term
obligations incurred to provide increased amounts of working
capital for long periods. When the amounts of the periodic
payments of an obligation are, by contract, measured by current
transactions, as for example by rents or revenues received in the
case of equipment trust certificates or by the depletion of
natural resources in the case of property obligations, the
portion of the total obligation to be included as a current
liability should be that representing the amount accrued at the
balance-
sheet date.

[fn4] There should, however, be full
disclosure that such obligation has been omitted from the current
liabilities and a statement of the reason for such omission
should be given. Cf note 1.

9. The amounts at which various current assets are carried do
not always represent their present realizable cash values.
Accounts receivable net of allowances for uncollectible accounts,
and for unearned discounts where unearned discounts are
considered, are effectively stated at the amount of cash
estimated as realizable. However, practice varies with respect to
the carrying basis for current assets such as marketable
securities and inventories. In the case of marketable securities
where market value is less than cost by a substantial amount and
it is evident that the decline in market value is not due to a
mere temporary condition, the amount to be included as a current
asset should not exceed the market value. The basis for carrying

inventories is stated in chapter 4. It is important that the
amounts at which current assets are stated be supplemented by
information which reveals, for temporary investments, their
market value at the balance-
sheet date, and for the various
classifications of inventory items, the basis upon which their
amounts are stated and, where practicable, indication of the
method of determining the cost  -- e.g., *average cost, first-
in
first-out, last-in first-
out*, etc.

Assent

*One member of the committee, Mr. Mason, assented with
qualification to adoption of section A of chapter 3.*

Mr. Mason does not accept the view implied in paragraph
6 that unamortized debt discount is an asset. Also,
referring to paragraph 9, he believes that the market
value is the most significant figure in connection with
marketable securities held as temporary investments of
cash, and would prefer to show such securities in the
accounts at their market value, whether greater or less
than cost. He would accept as an alternative the use of
cost in the accounts with market value shown
parenthetically in the balance sheet.

**Section B  --
Application of United States Government Securities
against Liabilities for Federal Taxes on Income**

1. It is a general principle of accounting that the offsetting
of assets and liabilities in the balance sheet is improper except
where a right of set-
off exists. An example of such exception was
the showing of United States Treasury Tax Notes, Tax Series
A-1943 and B-
1943, as a deduction from the liability for federal
taxes on income, which the committee approved in 1942.

2. In view of the special nature of the terms of the 1943 tax
notes, the intention of the purchaser to use them to pay federal
income taxes could be assumed, since he received no interest or
other advantage unless they were so used. Some purchasers
doubtless viewed their purchase of the notes as being, to all
intents and purposes, an advance payment of the taxes.

3. In the absence of evidence of a contrary intent, it was
considered acceptable, and in accordance with good accounting
practice, to show the notes in the current liability section of
the balance sheet as a deduction from federal taxes on income in
an amount not to exceed the accrued liability for such taxes. The
full amount of the accrued liability was to be shown with a
deduction for the tax payment value of the notes at the date of
the balance sheet.

4. It also was recognized as clearly proper to show the notes in
the current asset section of the balance sheet as any other
temporary investments are shown. If at the balance-

sheet date or
at the date of the independent auditor's report there was
evidence that the original intent was changed, the notes were to
be shown in the current asset section of the balance sheet.

5. Government securities having restrictive terms similar to
those contained in the 1943 tax series notes are no longer
issued, although certain other types of government securities
have since been issued which are acceptable in payment of
liabilities for federal taxes on income. However, because of the
effect on the current position of large tax accruals and the
related accumulations of liquid assets to meet such liabilities,
many companies have adopted the practice of acquiring and holding
government securities of various issues in amounts related to the
estimated tax liability. In their financial statements these
companies have often expressed this relationship by showing such
securities as a deduction from the tax liability, even though the
particular securities were not by their terms acceptable in
payment of taxes. If the government securities involved may, by
their terms, be surrendered in payment of taxes, the above
practice clearly falls within the principle of the permissive
exception described in paragraph 1. The committee further
believes that the extension of the practice to include the offset
of other types of United States government securities, although a
deviation from the general rule against offsets, is not so
significant a deviation as to call for an exception in an
accountant's report on the financial statements.

6. Suggestions have been received that similar considerations
may be advanced in favor of the offset of cash or other assets
against the income and excess profits tax liability or against
other amounts owing to the federal government. In the opinion of
the committee, however, any such extension or application of the
exception, recognized as to United States government securities
and liabilities for federal taxes on income, is not to be
regarded as acceptable practice.

Absent

   *One member of the committee, Mr. Calkins, assented with
qualification to adoption of section B of chapter 3.*

   Mr. Calkins does not approve the concluding sentence of
paragraph 5, which states that the offset of other types
of United States Government securities, although a
deviation from the general rule against offsets, is not
so significant a deviation as to call for an exception
in an accountant's report. He believes that the
significance of such a deviation is a matter for
judgment based on the facts of a particular case; that
the broader language of the statement constitutes a
condonation of the practice of offsetting against tax
liabilities United States Government obligations which
are not by their terms acceptable in payment of federal
taxes; and that the condonation of such a practice is
inconsistent with the opinion of the committee expressed
in paragraph 6, with which he agrees, that cash and
other assets should not be offset against liabilities
for federal taxes.

**Chapter 4: INVENTORY PRICING**

1. Whenever the operation of a business includes the ownership of a stock of goods, it is necessary for adequate financial accounting purposes that inventories be properly compiled periodically and recorded in the accounts.
[fn1] Such inventories are required both for the statement of financial position and for the periodic measurement of income.

[fn1] Prudent reliance upon perpetual inventory records is not precluded.

2. This chapter sets forth the general principles applicable to the pricing of inventories of mercantile and manufacturing enterprises. Its conclusions are not directed to or necessarily applicable to noncommercial businesses or to regulated utilities.

**Statement 1**

The term *inventory* is used herein to designate the aggregate of those items of tangible personal property which (1) are held for sale in the ordinary course of business, (2) are in process of production for such sale, or (3) are to be currently consumed in the production of goods or services to be available for sale.

**Discussion**

3. The term *inventory* embraces goods awaiting sale (the merchandise of a trading concern and the finished goods of a manufacturer), goods in the course of production (work in process), and goods to be consumed directly or indirectly in production (raw materials and supplies). This definition of inventories excludes long-term assets subject to depreciation accounting, or goods which, when put into use, will be so classified. The fact that a depreciable asset is retired from regular use and held for sale does not indicate that the item should be classified as part of the inventory. Raw materials and supplies purchased for production may be used or consumed for the construction of long-term assets or other purposes not related to production, but the fact that inventory items representing a small portion of the total may not be absorbed ultimately in the production process does not require separate classification. By trade practice, operating materials and supplies of certain types of companies such as oil producers are usually treated as inventory.

**Statement 2**

A major objective of accounting for inventories is the proper determination of income through the process of matching appropriate costs against revenues.

**Discussion**

4. An inventory has financial significance because revenues may be obtained from its sale, or from the sale of the goods or services in whose production it is used. Normally such revenues

arise in a continuous repetitive process or cycle of operations by which goods are acquired and sold, and further goods are acquired for additional sales. In accounting for the goods in the inventory at any point of time, the major objective is the matching of appropriate costs against revenues in order that there may be a proper determination of the realized income. Thus, the inventory at any given date is the balance of costs applicable to goods on hand remaining after the matching of absorbed costs with concurrent revenues. This balance is appropriately carried to future periods provided it does not exceed an amount properly chargeable against the revenues expected to be obtained from ultimate disposition of the goods carried forward. In practice, this balance is determined by the process of pricing the articles comprised in the inventory.

**Statement 3**

The primary basis of accounting for inventories is cost, which has been defined generally as the price paid or consideration given to acquire an asset. As applied to inventories, cost means in principle the sum of the applicable expenditures and charges directly or indirectly incurred in bringing an article to its existing condition and location.

**Discussion**

5. In keeping with the principle that accounting is primarily based on cost, there is a presumption that inventories should be stated at cost. The definition of cost as applied to inventories is understood to mean acquisition and production cost, [fn2] and its determination involves many problems. Although principles for the determination of inventory costs may be easily stated, their application, particularly to such inventory items as work in process and finished goods, is difficult because of the variety of problems encountered in the allocation of costs and charges. For example, under some circumstances, items such as idle facility expense, excessive spoilage, double freight, and rehandling costs may be so abnormal as to require treatment as current period charges rather than as a portion of the inventory cost. Also, general and administrative expenses should be included as period charges, except for the portion of such expenses that may be clearly related to production and thus constitute a part of inventory costs (product charges). Selling expenses constitute no part of inventory costs. It should also be recognized that the exclusion of all overheads from inventory costs does not constitute an accepted accounting procedure. The exercise of judgment in an individual situation involves a consideration of the adequacy of the procedures of the cost accounting system in use, the soundness of the principles thereof, and their consistent application.

[fn2] In the case of goods which have been written down below cost at the close of a fiscal period, such reduced amount is to be considered the cost for subsequent accounting purposes.

**Statement 4**

Cost for inventory purposes may be determined under any one
of several assumptions as to the flow of cost factors (such
as first-in first-out, average, and last-in first-
out); the
major objective in selecting a method should be to choose the
one which, under the circumstances, most clearly reflects
periodic income.

**Discussion**

6. The cost to be matched against revenue from a sale may not be
the identified cost of the specific item which is sold,
especially in cases in which similar goods are purchased at
different times and at different prices. While in some lines of
business specific lots are clearly identified from the time of
purchase through the time of sale and are costed on this basis,
ordinarily the identity of goods is lost between the time of
acquisition and the time of sale. In any event, if the materials
purchased in various lots are identical and interchangeable, the
use of identified cost of the various lots may not produce the
most useful financial statements. This fact has resulted in the
development of general acceptance of several assumptions with
respect to the flow of cost factors (such as *first-
in*
*first-out*, *average*, and *last-in first-
out*) to provide
practical bases for the measurement of periodic income.
[fn3] In
some situations a reversed mark-
up procedure of inventory
pricing, such as the retail inventory method, may be both
practical and appropriate. The business operations in some cases
may be such as to make it desirable to apply one of the
acceptable methods of determining cost to one portion of the
inventory or components thereof and another of the acceptable
methods to other portions of the inventory.

[fn3] Standard costs are acceptable if
adjusted at reasonable intervals to reflect current
conditions so that at the balance-
sheet date standard costs
reasonably approximate costs computed under one of the
recognized bases. In such cases descriptive language should
be used which will express this relationship, as, for
instance, "approximate costs determined on the first-
in
first-
out basis," or, if it is desired to mention standard
costs, "at first-
out basis," or, if it is desired to mention
standard costs, "at standard costs, approximating average
costs."

7. Although selection of the method should be made on the basis
of the individual circumstances, it is obvious that financial
statements will be more useful if uniform methods of inventory
pricing are adopted by all companies within a given industry.

**Statement 5**

A departure from the cost basis of pricing the inventory is required when the utility of the goods is no longer as great as its cost. Where there is evidence that the utility of goods, in their disposal in the ordinary course of business, will be less than cost, whether due to physical deterioration, obsolescence, changes in price levels, or other causes, the difference should be recognized as a loss of the current period. This is generally accomplished by stating such goods at a lower level commonly designated as *market*.

## Discussion

8. Although the cost basis ordinarily achieves the objective of a proper matching of costs and revenues, under certain circumstances cost may not be the amount properly chargeable against the revenues of future periods. A departure from cost is required in these circumstances because cost is satisfactory only if the utility of the goods has not diminished since their acquisition; a loss of utility is to be reflected as a charge against the revenues of the period in which it occurs. Thus, in accounting for inventories, a loss should be recognized whenever the utility of goods is impaired by damage, deterioration, obsolescence, changes in price levels, or other causes. The measurement of such losses is accomplished by applying the rule of pricing inventories at *cost or market, whichever is lower*. This provides a practical means of measuring utility and thereby determining the amount of the loss to be recognized and accounted for in the current period.

## Statement 6

As used in the phrase *lower of cost or market*, [fn4] the term *market* means current replacement cost (by purchase or by reproduction, as the case may be) except that:

(1) Market should not exceed the net realizable value (i.e., estimated selling price in the ordinary course of business less reasonably predictable costs of completion and disposal); and

(2) Market should not be less than net realizable value reduced by an allowance for an approximately normal profit margin.

[fn4] The terms *cost or market, whichever is lower* and *lower of cost or market* are used synonymously in general practice and in this chapter. The committee does not express any preference for either of the two alternatives.

## Discussion

9. The rule of *cost or market, whichever is lower* is intended to provide a means of measuring the residual usefulness of an inventory expenditure. The term market is therefore to be interpreted as indicating utility on the inventory date and may be thought of in terms of the equivalent expenditure which would have to be made in the ordinary course at that date to procure

corresponding utility. As a general guide, utility is indicated
primarily by the current cost of replacement of the goods as they
would be obtained by purchase or reproduction. In applying the
rule, however, judgment must always be exercised and no loss
should be recognized unless the evidence indicates clearly that a
loss has been sustained. There are therefore exceptions to such a
standard. Replacement or reproduction prices would not be
appropriate as a measure of utility when the estimated sales
value, reduced by the costs of completion and disposal, is lower,
in which case the realizable value so determined more
appropriately measures utility. Furthermore, where the evidence
indicates that cost will be recovered with an approximately
normal profit upon sale in the ordinary course of business, no
loss should be recognized even though replacement or reproduction
costs are lower. This might be true, for example, in the case of
production under firm sales contracts at fixed prices, or when a
reasonable volume of future orders is assured at stable selling
prices.

10. Because of the many variations of circumstances encountered
in inventory pricing, Statement 6 is intended as a guide rather
than a literal rule. It should be applied realistically in the
light of the objectives expressed in this chapter and with due
regard to the form, content, and composition of the inventory.
The committee considers, for example, that the retail inventory
method, if adequate markdowns are currently taken, accomplishes
the objectives described herein. It also recognizes that, if a
business is expected to lose money for a sustained period, the
inventory should not be written down to offset a loss inherent in
the subsequent operations.

**Statement 7**

Depending on the character and composition of the inventory, the
rule of *cost or market, whichever is lower* may properly be
applied either directly to each item or to the total of the
inventory (or, in some cases, to the total of the components of
each major category). The method should be that which most
clearly reflects periodic income.

**Discussion**

11. The purpose of reducing inventory to *market* is to reflect
fairly the income of the period. The most common practice is to
apply the *lower of cost or market* rule separately to each item
of the inventory. However, if there is only one end-
product
category the cost utility of the total stock  --
the inventory in
its entirety  --
may have the greatest significance for accounting
purposes. Accordingly, the reduction of individual items to
*market* may not always lead to the most useful result if the
utility of the total inventory to the business is not below its
cost. This might be the case if selling prices are not affected
by temporary or small fluctuations in current costs of purchase
or manufacture. Similarly, where more than one major product or
operational category exists, the application of the *cost or
market, whichever is lower* rule to the total of the items
included in such major categories may result in the most useful

determination of income.

12. When no loss of income is expected to take place as a result of a reduction of cost prices of certain goods because others forming components of the same general categories of finished products have a market equally in excess of cost, such components need not be adjusted to market to the extent that they are in balanced quantities. Thus, in such cases, the rule of *cost or market, whichever is lower* may be applied directly to the totals of the entire inventory, rather than to the individual inventory items, if they enter into the same category of finished product and if they are in balanced quantities, provided the procedure is applied consistently from year to year.

13. To the extent, however, that the stocks of particular materials or components are excessive in relation to others, the more widely recognized procedure of applying the *lower of cost or market* to the individual items constituting the excess should be followed. This would also apply in cases in which the items enter into the production of unrelated products or products having a material variation in the rate of turnover. Unless an effective method of classifying categories is practicable, the rule should be applied to each item in the inventory.

14. When substantial and unusual losses result from the application of this rule it will frequently be desirable to disclose the amount of the loss in the income statement as a charge separately identified from the consumed inventory costs described as *cost of goods sold*.

**Statement 8**

    The basis of stating inventories must be consistently applied and should be disclosed in the financial statements; whenever a significant change is made therein, there should be disclosure of the nature of the change and, if material, the effect on income.

**Discussion**

15. While the basis of stating inventories does not affect the over-
all gain or loss on the ultimate disposition of inventory items, any inconsistency in the selection or employment of a basis may improperly affect the periodic amounts of income or loss. Because of the common use and importance of periodic statements, a procedure adopted for the treatment of inventory items should be consistently applied in order that the results reported may be fairly allocated as between years. A change of such basis may have an important effect upon the interpretation of the financial statements both before and after that change, and hence, in the event of a change, a full disclosure of its nature and of its effect, if material, upon income should be made.

**Statement 9**

    Only in exceptional cases may inventories properly be stated above cost. For example, precious metals having a fixed monetary value with no substantial cost of marketing may be

stated at such monetary value; any other exceptions must be justifiable by inability to determine appropriate approximate costs, immediate marketability at quoted market price, and the characteristic of unit interchangeability. Where goods are stated above cost this fact should be fully disclosed.

**Discussion**

16. It is generally recognized that income accrues only at the time of sale, and that gains may not be anticipated by reflecting assets at their current sales prices. For certain articles, however, exceptions are permissible. Inventories of gold and silver, when there is an effective government-controlled market at a fixed monetary value, are ordinarily reflected at selling prices. A similar treatment is not uncommon for inventories representing agricultural, mineral, and other products, units of which are interchangeable and have an immediate marketability at quoted prices and for which appropriate costs may be difficult to obtain. Where such inventories are stated at sales prices, they should of course be reduced by expenditures to be incurred in disposal, and the use of such basis should be fully disclosed in the financial statements.

**Statement 10**

Accrued net losses on firm purchase commitments for goods for inventory, measured in the same way as are inventory losses, should, if material, be recognized in the accounts and the amounts thereof separately disclosed in the income statement.

**Discussion**

17. The recognition in a current period of losses arising from the decline in the utility of cost expenditures is equally applicable to similar losses which are expected to arise from firm, uncancelable, and unhedged commitments for the future purchase of inventory items. The net loss on such commitments should be measured in the same way as are inventory losses and, if material, should be recognized in the accounts and separately disclosed in the income statement. The utility of such commitments is not impaired, and hence there is no loss, when the amounts to be realized from the disposition of the future inventory items are adequately protected by firm sales contracts or when there are other circumstances which reasonably assure continuing sales without price decline.

*One member of the committee, Mr. Wellington, assented with qualification, and two members, Messrs. Mason and Peloubet, dissented to adoption of chapter 4.*

Mr. Wellington objects to footnote (2) to statement 3. He believes that an exception should be made for goods costed on the *last-in first-out* (LIFO) basis. In the case of goods costed on all bases other than LIFO the reduced amount (market below cost) is cleared from the accounts through the regular accounting entries of the subsequent period, and if the market price rises to or above the original cost there will be an increased

profit in the subsequent period. Accounts kept under the
LIFO method should also show a similar increased profit
in the subsequent period, which will be shown if the
LIFO inventory is restored to its original cost. To do
otherwise, as required by footnote (2), is to carry the
LIFO inventory, not at the lower of cost or current
market, but at the lowest market ever known since the
LIFO method was adopted by the company.

   Mr. Mason dissents from this chapter because of its
acceptance of the inconsistencies inherent in *cost or
market whichever is lower*. In his opinion a drop in
selling price below cost is no more of a realized loss
than a rise above cost is a realized gain under a
consistent criterion of realization.

   Mr. Peloubet believes it is ordinarily preferable to
carry inventory at not less than recoverable cost, and
particularly in the case of manufactured or partially
manufactured goods which can be sold only in finished
form. He recognizes that application of the *cost or
market* valuation basis necessitates the shifting of
income from one period to another, but objects to
unnecessarily accentuating this shift by the use, even
limited as it is in this chapter, of reproduction or
replacement cost as market when such cost is less than
net selling price.

**Chapter 5: INTANGIBLE ASSETS**

1. This chapter deals with problems involved in accounting for
certain types of assets classified by accountants as intangibles,
specifically, those acquired by the issuance of securities or
purchased for cash or other consideration. Such assets may be
purchased or acquired separately for a specified consideration or
may be purchased or acquired, together with other assets, for a
lump-
sum consideration without specification by either the seller
or the purchaser, at the time of purchase, of the portions of the
total price which are applicable to the respective assets thus
acquired. In dealing with the intangible assets herein
considered, important questions arise as to the initial carrying
amount of such assets, the amortization of such amount where
their term of existence is definitely limited or problematical,
and their write-down or write-
off at some later time where there
is a substantial and permanent decline in the value of such
assets. These questions involve basic accounting principles of
balance-
sheet presentation and income determination and this
chapter is designed to promote a fuller consideration of those
principles. It does not, however, deal with the problems of
accounting for intangibles developed in the regular course of
business by research, experimentation, advertising, or otherwise.

**Classification of Intangibles**

2. The intangibles herein considered may be broadly classified
as follows:

a. Those having a term of existence limited by law,
   regulation, or agreement, or by their nature (such as
   patents, copyrights, leases, licenses, franchises for a
   fixed term, and goodwill as to which there is evidence
   of limited duration);

b. Those having no such limited term of existence and as
   to which there is, at the time of acquisition, no
   indication of limited life (such as goodwill generally,
   going value, trade names, secret processes, subscription
   lists, perpetual franchises, and organization costs).

3. The intangibles described above will hereinafter be referred
to as type (a) and type (b) intangibles, respectively. The
portion of a lump-
sum consideration deemed to have been paid for
   intangible elements when a mixed aggregate of tangible and
   intangible property is acquired, or the excess of a parent
   company's investment in the stock of a subsidiary over its equity
   in the net assets of the subsidiary as shown by the latter's
   books at the date of acquisition, in so far as that excess would
   be treated as an intangible in consolidated financial statements
   of the parent and the subsidiary, may represent intangibles of
   either type (a) or type (b) or a combination of both.

**Initial Carrying Amount**

4. The initial amount assigned to all types of intangibles
   should be cost, in accordance with the generally accepted
   accounting principle that assets should be stated at cost when
   they are acquired. In the case of non-
cash acquisitions, as, for
   example, where intangibles are acquired in exchange for
   securities, cost may be considered as being either the fair value
   of the consideration given or the fair value of the property or
   right acquired, whichever is the more clearly evident.

**Amortization of Intangibles**

**Type (a)**

5. The cost of type (a) intangibles should be amortized by
   systematic charges in the income statement over the period
   benefited, as in the case of other assets having a limited period
   of usefulness. If it becomes evident that the period benefited
   will be longer or shorter than originally estimated, recognition
   thereof may take the form of an appropriate decrease or increase
   in the rate of amortization or, if such increased charges would
   result in distortion of income, a partial write-
down may be made
   by a charge to earned surplus.

**Type (b)**

6. When it becomes reasonably evident that the term of existence
   of a type (b) intangible has become limited and that it has
   therefore become a type (a) intangible, its cost should be
   amortized by systematic charges in the income statement over
   the estimated remaining period of usefulness. If, however,
   the period of amortization is relatively short so that

misleading inferences might be drawn as a result of inclusion
of substantial charges in the income statement a partial
write-down may be made by a charge to earned surplus.
[fn1]
and the rest of the cost may be amortized over the remaining
period of usefulness.

[fn1] See chapter 8, paragraphs 11, 12, and 13.

7. When a corporation decides that a type (b) intangible may not
continue to have value during the entire life of the enterprise
it may amortize the cost of such intangible by systematic charges
against income despite the fact that there are no present
indications of limited existence or loss of value which would
indicate that it has become type (a), and despite the fact that
expenditures are being made to maintain its value. Such
amortization is within the discretion of the company and is not
to be regarded as obligatory. The plan of amortization should be
reasonable; it should be based on all the surrounding
circumstances, including the basic nature of the intangible and
the expenditures currently being made for development,
experimentation, and sales promotion. Where the intangible is an
important income-
producing factor and is currently being
maintained by advertising or otherwise, the period of
amortization should be reasonably long. The procedure should be
formally approved and the reason for amortization, the rate used,
and the shareholders' or directors' approval thereof should be
disclosed in the financial statements.

**Write-
off of Intangibles**

8. The cost of type (b) intangibles should be written off when
it becomes reasonably evident that they have become worthless.
Under such circumstances the amount at which they are carried
on the books should be charged off in the income statement or,
if the amount is so large that its effect on income may give
rise to misleading inferences, it should be charged to earned
surplus.
[fn1] In determining whether an investment in type (b)
intangibles has become or is likely to become worthless,
consideration should be given to the fact that in some cases
intangibles acquired by purchase may merge with, or be replaced
by, intangibles acquired or developed with respect to other
products or lines of business and that in such circumstances the
discontinuance of a product or line of business may not in fact
indicate loss of value.

[fn1] See chapter 8, paragraphs 11, 12, and 13.

**Limitation on Write-
off of Intangibles**

9. Lump-sum write-
offs of intangibles should not be made to
earned surplus immediately after acquisition, nor should
intangibles be charged against capital surplus. If not amortized
systematically, intangibles should be carried at cost until an
event has taken place which indicates a loss or a limitation on

the useful life of the intangibles.

**Purchase of Subsidiary's Stock or Basket Purchase of Assets**

10. A problem arises in cases where a group of intangibles or a mixed aggregate of tangible and intangible property is acquired for a lump-sum consideration, or when the consideration given for a stock investment in a subsidiary is greater than the net assets of such subsidiary applicable thereto, as carried on its books at the date of acquisition. In this latter type of situation there is a presumption that the parent company, in effect, placed a valuation greater than their carrying amount on some of the assets of the subsidiary in arriving at the price it was willing to pay for its investment therein. The parent corporation may have (a) paid amounts in excess of carrying amounts for specific assets of the subsidiary or (b) paid for the general goodwill of the subsidiary. In these cases, if practicable, there should be an allocation, as between tangible and intangible property, of the cost of the mixed aggregate of property or of the excess of a parent's investment over its share of the amount at which the subsidiary carried its net assets on its books at the date of acquisition. Any amount allocated to intangibles should be further allocated to determine, if practicable, a separate cost for each type (a) intangible and for at least the aggregate of all type (b) intangibles. The amounts so allocated to intangibles should thereafter be dealt with in accordance with the procedures outlined in this chapter.

**Chapter 6: CONTINGENCY RESERVES**

1. The purpose of this chapter is to consider problems which arise in the accounting treatment of two types of reserves whose misuse may be the means of either arbitrarily reducing income or shifting income from one period to another:

   a. General contingency reserves whose purposes are not specific;

   b. Reserves designed to set aside a part of current profits to absorb losses feared or expected in connection with inventories on hand or future purchases of inventory.

2. Charges to provide, either directly or by use of a reserve, for losses due to obsolescence or deterioration of inventory or for reducing an inventory to market, or for reducing an inventory to a recognized basis such as last-in first-out or its equivalent in accordance with an announced change in policy to be consistently followed thereafter, are not under consideration here.

3. If a provision for a reserve, made against income, is not properly chargeable to current revenues, net income for the period is understated by the amount of the provision. If a reserve so created is used to relieve the income of subsequent periods of charges that would otherwise be made against it, the income of such subsequent periods is thereby overstated. By use of the reserve in this manner, profit for a given period may be

significantly increased or decreased by mere whim. As a result of this practice the integrity of financial statements is impaired, and the statements tend to be misleading.

4. The committee recognizes the character of the income statement as a tentative instalment in the record of long-time financial results, and is aware of the tendency to exaggerate the significance of the net income for a single year.
[fn1]
Nevertheless, there still exists the responsibility for determining net income as fairly as possible by sound methods consistently applied and the duty to show it clearly. In accomplishing these objectives, it is deemed desirable to provide, by charges in the current income statement, properly classified, for all foreseeable costs and losses applicable against current revenues, to the extent that they can be measured and allocated to fiscal periods with reasonable approximation.

[fn1] See chapter 2B; also chapter 8, paragraphs 11, 12, and 13.

5. Accordingly, inventories on hand or contracted for should be priced in accordance with principles stated elsewhere by the committee.
[fn2] When inventories which have been priced in accordance with those principles are further written down by a charge to income, either directly or through the use of a reserve, current revenues are not properly matched with applicable costs, and charges to future operations are correspondingly reduced. This process results in the shifting of profits from one period to another in violation of the principle that reserves should not be used for the purpose of equalizing reported income.

[fn2] See chapter 4.

6. It has been argued with respect to inventories that losses which will have to be taken in periods of receding price levels have their origins in periods of rising prices, and that therefore reserves to provide for future price declines should be created in periods of rising prices by charges against the operations of those periods. Reserves of this kind involve assumptions as to what future price levels will be, what inventory quantities will be on hand if and when a major price decline takes place, and finally whether loss to the business will be measured by the amount of the decline in prices. The bases for such assumptions are so uncertain that any conclusions drawn from them would generally seem to be speculative guesses rather than informed judgments. When estimates of this character are included in current costs, amounts representing mere conjecture are combined with others representing reasonable approximations.

7. The committee is therefore of the opinion that reserves such as those created:

a. for general undetermined contingencies, or

b. for any indefinite possible future losses, such as,
   for example, losses on inventories not on hand or

```
           contracted for, or
```

c. for the purpose of reducing inventories other than to
   a basis which is in accordance with generally accepted
   accounting principles,
[fn3] or

d. without regard to any specific loss reasonably related
   to the operations of the current period, or

e. in amounts not determined on the basis of any
   reasonable estimates of costs or losses

are of such a nature that charges or credits relating to
such reserves should not enter into the determination of
net income.

[fn3] See particularly chapter 4.

8. Accordingly, it is the opinion of the committee that if a
reserve of the type described in paragraph 7 is set up:

a. it should be created by a segregation or appropriation
   of earned surplus,

b. no costs or losses should be charged to it and no part
   of it should be transferred to income or in any way used
   to affect the determination of net income for any year,
[fn4]

c. it should be restored to earned surplus directly when
   such a reserve or any part thereof is no longer
   considered necessary,
[fn4] and

d. it should preferably be classified in the balance
   sheet as a part of shareholders' equity.

[fn4] Items (b) and (c) of paragraph 8 also apply to contingency
reserves set up in prior years.

[fn4] Items (b) and (c) of paragraph 8 also apply to contingency
reserves set up in prior years.

**Chapter 7: CAPITAL ACCOUNTS**

**Section A  -- Quasi-
Reorganization or Corporate Readjustment
(Amplification of Institute Rule No. 2 of 1934)**

1. A rule was adopted by the Institute in 1934 which read as
follows:

    "Capital surplus, however created, should not be used to
    relieve the income account of the current or future years of
    charges which would otherwise fall to be made thereagainst.
    This rule might be subject to the exception that where, upon
    reorganization, a reorganized company would be relieved of
    charges which would require to be made against income if the
    existing corporation were continued, it might be regarded as

permissible to accomplish the same result without
reorganization provided the facts were as fully revealed to
and the action as formally approved by the shareholders as in
reorganization."[fn1]

[fn1] See chapter 1A, paragraph 2.

2. Readjustments of the kind mentioned in the exception to the
rule fall in the category of what are called
quasi-
reorganizations. This section does not deal with the
general question of quasi-
reorganizations, but only with cases in
which the exception permitted under the rule of 1934 is availed
of by a corporation. Hereinafter such cases are referred to as
readjustments. The problems which arise fall into two groups: (a)
what may be permitted in a readjustment and (b) what may be
permitted thereafter.

**Procedure in Readjustment**

3. If a corporation elects to restate its assets, capital stock,
and surplus through a readjustment and thus avail itself of
permission to relieve its future income account or earned surplus
account of charges which would otherwise be made thereagainst, it
should make a clear report to its shareholders of the
restatements proposed to be made, and obtain their formal
consent. It should present a fair balance sheet as at the date of
the readjustment, in which the adjustment of carrying amounts is
reasonably complete, in order that there may be no continuation
of the circumstances which justify charges to capital surplus.

4. A write-
down of assets below amounts which are likely to be
realized thereafter, though it may result in conservatism in the
balance sheet at the readjustment date, may also result in
overstatement of earnings or of earned surplus when the assets
are subsequently realized. Therefore, in general, assets should
be carried forward as of the date of readjustment at fair and not
unduly conservative amounts, determined with due regard for the
accounting to be employed by the company thereafter. If the fair
value of any asset is not readily determinable a conservative
estimate may be made, but in that case the amount should be
described as an estimate and any material difference arising
through realization or otherwise and not attributable to events
occurring or circumstances arising after that date should not be
carried to income or earned surplus.

5. Similarly, if potential losses or charges are known to have
arisen prior to the date of readjustment but the amounts thereof
are then indeterminate, provision may properly be made to cover
the maximum *probable* losses or charges. If the amounts provided
are subsequently found to have been excessive or insufficient,
the difference should not be carried to earned surplus nor used
to offset losses or gains originating after the readjustment, but
should be carried to capital surplus.

6. When the amounts to be written off in a readjustment have
been determined, they should be charged first against earned
surplus to the full extent of such surplus; any balance may then

be charged against capital surplus. A company which has subsidiaries should apply this rule in such a way that no consolidated earned surplus survives a readjustment in which any part of losses has been charged to capital surplus.

7. If the earned surplus of any subsidiaries cannot be applied against the losses before resort is had to capital surplus, the parent company's interest in such earned surplus should be regarded as capitalized by the readjustment just as surplus at the date of acquisition is capitalized, so far as the parent is concerned.

8. The effective date of the readjustment, from which the income of the company is thereafter determined, should be as near as practicable to the date on which formal consent of the stockholders is given, and should ordinarily not be prior to the close of the last completed fiscal year.

**Procedure after Readjustment**

9. When the readjustment has been completed, the company's accounting should be substantially similar to that appropriate for a new company.

10. After such a readjustment earned surplus previously accumulated cannot properly be carried forward under that title. A new earned surplus account should be established, dated to show that it runs from the effective date of the readjustment, and this dating should be disclosed in financial statements until such time as the effective date is no longer deemed to possess any special significance.

11. Capital surplus originating in such a readjustment is restricted in the same manner as that of a new corporation; charges against it should be only those which may properly be made against the initial surplus of a new corporation.

12. It is recognized that charges against capital surplus may take place in other types of readjustments to which the foregoing provisions would have no application. Such cases would include readjustments for the purpose of correcting erroneous credits made to capital surplus in the past. In this statement the committee has dealt only with that type of readjustment in which either the current income or earned surplus account or the income account of future years is relieved of charges which would otherwise be made thereagainst.

**Section B  -- Stock Dividends and Stock Split-ups**

1. The term *stock dividend* as used in this section refers to an issuance by a corporation of its own common shares to its common shareholders without consideration and under conditions indicating that such action is prompted mainly by a desire to give the recipient shareholders some ostensibly separate evidence of a part of their respective interests in accumulated corporate earnings without distribution of cash or other property which the board of directors deems necessary or desirable to retain in the business.

2. The term *stock split-
up* as used in this chapter refers to
  an issuance by a corporation of its own common shares to its
  common shareholders without consideration and under conditions
  indicating that such action is prompted mainly by a desire to
  increase the number of outstanding shares for the purpose of
  effecting a reduction in their unit market price and, thereby, of
  obtaining wider distribution and improved marketability of the
  shares.

3. This chapter is not concerned with the accounting for a
  distribution or issuance to shareholders of (a) shares of another
  corporation theretofore held as an investment, or (b) shares of a
  different class, or (c) rights to subscribe for additional shares
  or (d) shares of the same class in cases where each shareholder
  is given an election to receive cash or shares.

4. The discussion of accounting for stock dividends and
  split-
ups that follows is divided into two parts. The first deals
  with the problems of the recipient. The second deals with the
  problems of the issuer.

**As to the Recipient**

5. One of the basic problems of accounting is that of income
  determination. Complete discussion of this problem is obviously
  beyond the scope of this chapter. Basically, income is a realized
  gain and in accounting is recognized, recorded, and stated in
  accordance with certain principles as to time and amount.

6. In applying the principles of income determination to the
  accounts of a shareholder of a corporation, it is generally
  agreed that the problem of determining his income is distinct
  from the problem of income determination by the corporation
  itself. The income of the corporation is determined as that of a
  separate entity without regard to the equity of the respective
  shareholders in such income. Under conventional accounting
  concepts, the shareholder has no income solely as a result of the
  fact that the corporation has income; the increase in his equity
  through undistributed earnings is no more than potential income
  to him. It is true that income earned by the corporation may
  result in an enhancement in the market value of the shares, but
  until there is a distribution, division, or severance of
  corporate assets, the shareholder has no income. If there is an
  increase in the market value of his holdings, such unrealized
  appreciation is not income. In the case of a stock dividend or
  split-
up, there is no distribution, division, or severance of
  corporate assets. Moreover, there is nothing resulting therefrom
  that the shareholder can realize without parting with some of his
  proportionate interest in the corporation.

7. The foregoing are important points to be considered in any
  discussion of the accounting procedures to be followed by the
  recipient of a stock dividend or split-
up since many arguments
  put forward by those who favor recognizing stock dividends as
  income are in substance arguments for the recognition of
  corporate income as income to the shareholder as it accrues to

the corporation, and prior to its distribution to the shareholder; the acceptance of such arguments would require the abandonment of the *separate entity* concept of corporation accounting.

8. The question as to whether or not stock dividends are income has been extensively debated; the arguments pro and con are well known.
[fn1] The situation cannot be better summarized, however, than in the words approved by Mr. Justice Pitney in *Eisner v. Macomber*, 252 U.S. 189, wherein it was held that stock dividends are not income under the Sixteenth Amendment, as follows:

> "A stock dividend really takes nothing from the property of the corporation and adds nothing to the interests of the stockholders. Its property is not diminished and their interests are not increased . . . the proportional interest of each shareholder remains the same. The only change is in the evidence which represents that interest, the new shares and the original shares together representing the same proportional interests that the original shares represented before the issue of the new ones."

[fn1] See, for instance, Freeman, "Stock Dividends and the New York Stock Exchange," *American Economic Review*, December, 1931 (pro), and Whitaker, "Stock Dividends, Investment Trusts, and the Exchange," *American Economic Review*, June, 1931 (con).

9. Since a shareholder's interest in the corporation remains unchanged by a stock dividend or split-up except as to the number of share units constituting such interest, the cost of the shares previously held should be allocated equitably to the total shares held after receipt of the stock dividend or split-up. When any shares are later disposed of, a gain or loss should be determined on the basis of the adjusted cost per share.

**As to the Issuer**

***Stock dividends***

10. As has been previously stated, a stock dividend does not, in fact, give rise to any change whatsoever in either the corporation's assets or its respective shareholders' proportionate interests therein. However, it cannot fail to be recognized that, merely as a consequence of the expressed purpose of the transaction and its characterization as a *dividend* in related notices to shareholders and the public at large, many recipients of stock dividends look upon them as distributions of corporate earnings and usually in an amount equivalent to the fair value of the additional shares received. Furthermore, it is to be presumed that such views of recipients are materially strengthened in those instances, which are by far the most numerous, where the issuances are so small in comparison with the shares previously outstanding that they do not have any apparent effect upon the share market price and, consequently, the market value of the shares previously held remains substantially unchanged. The committee therefore believes that where these

circumstances exist the corporation should in the public interest account for the transaction by transferring from earned surplus to the category of permanent capitalization (represented by the capital stock and capital surplus accounts) an amount equal to the fair value of the additional shares issued. Unless this is done, the amount of earnings which the shareholder may believe to have been distributed to him will be left, except to the extent otherwise dictated by legal requirements, in earned surplus subject to possible further similar stock issuances or cash distributions.

11. Where the number of additional shares issued as a stock dividend is so great that it has, or may reasonably be expected to have, the effect of materially reducing the share market value, the committee believes that the implications and possible constructions discussed in the preceding paragraph are not likely to exist and that the transaction clearly partakes of the nature of a stock split-
up as defined in paragraph 2. Consequently, the committee considers that under such circumstances there is no need to capitalize earned surplus, other than to the extent occasioned by legal requirements. It recommends, however, that in such instances every effort be made to avoid the use of the word *dividend* in related corporate resolutions, notices, and announcements and that, in those cases where because of legal requirements this cannot be done, the transaction be described, for example, as a *split-*
*up effected in the form of a dividend*.

12. In cases of closely-
held companies, it is to be presumed that the intimate knowledge of the corporations' affairs possessed by their shareholders would preclude any such implications and possible constructions as are referred to in paragraph 10. In such cases, the committee believes that considerations of public policy do not arise and that there is no need to capitalize earned surplus other than to meet legal requirements.

13. Obviously, the point at which the relative size of the additional shares issued becomes large enough to materially influence the unit market price of the stock will vary with individual companies and under differing market conditions and, hence, no single percentage can be laid down as a standard for determining when capitalization of earned surplus in excess of legal requirements is called for and when it is not. However, on the basis of a review of market action in the case of shares of a number of companies having relatively recent stock distributions, it would appear that there would be few instances involving the issuance of additional shares of less than, say, 20% or 25% of the number previously outstanding where the effect would not be such as to call for the procedure referred to in paragraph 10.

14. The corporate accounting recommended in paragraph 10 will in many cases, probably the majority, result in the capitalization of earned surplus in an amount in excess of that called for by the laws of the state of incorporation; such laws generally require the capitalization only of the par value of the shares issued, or, in the case of shares without par value, an amount usually within the discretion of the board of directors. However,

these legal requirements are, in effect, minimum requirements and do not prevent the capitalization of a larger amount per share.

**Stock Split-ups**

15. Earlier in this chapter a stock split-up was defined as being confined to transactions involving the issuance of shares, without consideration moving to the corporation, for the purpose of effecting a reduction in the unit market price of shares of the class issued and, thus, of obtaining wider distribution and improved marketability of the shares. Where this is clearly the intent, no transfer from earned surplus to capital surplus or capital stock account is called for, other than to the extent occasioned by legal requirements. It is believed, however, that few cases will arise where the aforementioned purpose can be accomplished through an issuance of shares which is less than, say, 20% or 25% of the previously outstanding shares.

16. The committee believes that the corporation's representations to its shareholders as to the nature of the issuance is one of the principal considerations in determining whether it should be recorded as a stock dividend or a split-up. Nevertheless, it believes that the issuance of new shares in ratios of less than, say, 20% or 25% of the previously outstanding shares, or the frequent recurrence of issuances of shares, would destroy the presumption that transactions represented to be split-ups should be recorded as split-ups.

Dissent

Three members of the committee, Messrs. Knight, Calkins, and Mason, assented with qualification, and one member, Mr. Wilcox, dissented to adoption of section B of chapter 7.

Mr. Knight assents with the qualification that he believes the section should recognize the propriety of treating as income stock dividends received by a parent from a subsidiary. He believes the section should have retained from the original Bulletin No. 11 the statement, "It is recognized that this rule, under which the stockholder has no income until there is a distribution, division, or severance, may require modification in some cases, or that there may be exceptions to it, as, for instance, in the case of a parent company with respect to its subsidiaries. . . ."

Messrs. Calkins and Mason approve part one, but believe part two is inconsistent therewith in that the former concludes that a stock dividend is not income to the recipient while the latter suggests accounting procedures by the issuer based on the assumption that the shareholder may think otherwise. They believe it is inappropriate for the corporate entity to base its accounting on considerations of possible shareholder reactions. They also believe that part two deals with

matters of corporate policy rather than accounting
principles and that the purpose sought to be served
could be more effectively accomplished by appropriate
notices to shareholders at the time of the issuance of
additional shares.

Mr. Wilcox dissents from the recommendations made both as
to the recipient and as to the issuer. He believes that,
with proper safeguards, stock dividends should be
regarded as marking the point at which corporate income
is to be recognized by shareholders, and denies that the
arguments favoring this view are in substance arguments
for the recognition of corporate income as income to the
shareholder as it accrues to the corporation. He
believes that the arguments regarding severance and
maintenance of proportionate interest are unsound, and
cannot logically be invoked as they are in this section,
since they are widely ignored with respect to
distributions of securities other than common stock
dividends. Mr. Wilcox believes the recommendations as to
the issuer are inconsistent with the rest of the
section, involve arbitrary distinctions, hamper or
discourage desirable corporate actions, result in
meaningless segregation in the proprietorship section of
balance sheets, and serve no informative purpose which
cannot be better served by explanatory disclosures. He
therefore also dissents from the omission of
requirements for information and disclosures which were
contained in the original Bulletin No. 11 issued in
September, 1941.

**Section C  --**
**Business Combinations**

1. Whenever two or more corporations are brought together,
or combined, for the purpose of carrying on in a single
corporation the previously conducted businesses, the
accounting to give effect to the combination will vary
depending upon whether there is a continuance of the former
ownership or a new ownership.
[fn1] This section (a) differentiates
these two types of corporate combinations, the first of
which is designated herein as a *pooling of interests* and the
second as a *purchase;* and (b) indicates the nature of the
accounting treatment appropriate to each type.

[fn1] When the shares of stock in the
surviving corporation that are received by the several owners of
one of the predecessor companies are not substantially in
proportion to their respective interests in the predecessor
company, a new ownership or purchase of such company is presumed
to result.

2. For accounting purposes, the distinction between a pooling of
interests and a purchase is to be found in the attendant
circumstances rather than in the legal designation as a merger or
a consolidation, or in legal considerations with respect to
availability of net assets for dividends, or provisions of the
Internal Revenue Code with respect to income taxes. In a pooling
of interests, all or substantially all of the equity interests in

predecessor corporations continue, as such, in a surviving corporation [fn1] which may be one of the predecessor corporations, or in a new one created for the purpose. In a purchase, on the other hand, an important part or all of the ownership of the acquired corporation is eliminated. A plan or firm intention and understanding to retire capital stock issued to the owners of one or more of the corporate parties, or substantial changes in ownership occurring immediately before or after the combination, would also tend to indicate that the combination is a purchase.

[fn1] When the shares of stock in the surviving corporation that are received by the several owners of one of the predecessor companies are not substantially in proportion to their respective interests in the predecessor company, a new ownership or purchase of such company is presumed to result.

3. Other factors to be taken into consideration in determining whether a purchase or a pooling of interests is involved are the relative size of the constituent companies and the continuity of management or power to control the management. Thus, a purchase may be indicated when one corporate party to a combination is quite minor in size in relation to the others, or where the management of one of the corporate parties to the combination is eliminated or its influence upon the management of the surviving corporation is very small. Other things being equal, the presumption that a pooling of interests is involved would be strengthened if the activities of the businesses to be combined are either similar or complementary. No one of these factors would necessarily be determinative, but their presence or absence would be cumulative in effect.

4. When a combination is deemed to be a purchase the assets purchased should be recorded on the books of the acquiring company at cost, measured in money or the fair value of other consideration given, or at the fair value of the property acquired, whichever is more clearly evident. This is in accordance with the procedure applicable to accounting for purchases of assets.

5. When a combination is deemed to be a pooling of interests, the necessity for a new basis of accountability does not arise. The carrying amounts of the assets of the constituent companies, if stated in conformity with generally accepted accounting principles and appropriately adjusted when deemed necessary to place them on a uniform basis, should be carried forward; and earned surpluses of the constituent companies may be carried forward. However, any adjustment of assets or of surplus which would be in conformity with generally accepted accounting principles in the absence of a combination would be equally so if effected in connection with a pooling of interests. If one party to such a combination had been acquired by purchase as a subsidiary by another such party prior to the origin of a plan of combination, the parent's share of the earned surplus of the subsidiary prior to such acquisition should not be included in the earned surplus account of the pooled companies.

6. Because of the variety of conditions under which a pooling of interests may be carried out it is not practicable to deal with

the accounting presentation except in general terms. A number of problems will arise. For example, the stated capital of the surviving corporation in a pooling of interests may be either more than, or less than, the total of the stated capital of the predecessor corporations. In the former event the excess should be deducted first from the total of any other contributed capital (capital surplus), and next from the total of any earned surplus of the predecessors, while in the latter event the difference should appear in the balance sheet of the surviving corporation as other contributed capital (capital surplus), analogous to that created by a reduction in stated capital where no combination is involved.

7. When a combination results in carrying forward the earned surpluses of the constituent companies, statements of operations issued by the continuing business for the period in which the combination occurs and for any preceding period should show the results of operations of the combined interests.

**Chapter 8: INCOME AND EARNED SURPLUS**

1. The purpose of this chapter is to recommend criteria for use in identifying material extraordinary charges and credits which may in some cases and should in other cases be excluded from the determination of net income and to recommend methods of presenting these charges and credits.

2. In dealing with the problem of selecting the most useful form of income statement, the danger of understatement or overstatement of income must be recognized. An important objective of income presentation should be the avoidance of any practice that leads to income equalization.

3. Attention is directed to certain facts which serve to emphasize that the word *income* is used to describe a general concept, not a specific and precise thing, and that the income statement is based on the concept of the *going concern*. It is at best an interim report. Profits are not fundamentally the result of operations during any short period of time. Allocations to fiscal periods of both charges and credits affecting the determination of net income are, in part, estimated and conventional and based on assumptions as to future events which may be invalidated by experience. While the items of which this is true are usually few in relation to the total number of transactions, they sometimes are large in relation to the other amounts in the income statement.

4. It must also be recognized that the ultimate distinction between *operating* income and charges and *non-operating* gains and losses, terms having considerable currency in the accounting profession, has not been established. The former are generally defined as recurrent features of business operation, more or less normal and dependable in their incidence from year to year; the latter are generally considered to be irregular and unpredictable, more or less fortuitous and incidental. The committee is also mindful that the term *net income* has been used indiscriminately and often without precise, and most certainly without uniform, definition in the financial press, investment services, annual reports, prospectuses, contracts

relating to compensation of management, bond indentures, preferred stock dividend provisions, and many other places.

5. In the committee's view, the above facts with respect to the income statement and the income which it displays make it incumbent upon readers of financial statements to exercise great care at all times in drawing conclusions from them.

6. The question of what constitutes the most practically useful concept of income for the year is one on which there is much difference of opinion. On the one hand, net income is defined according to a strict proprietary concept by which it is presumed to be determined by the inclusion of all items affecting the net increase in proprietorship during the period except dividend distributions and capital transactions. The form of presentation which gives effect to this broad concept of net income has sometimes been designated the *all-inclusive* income statement.
On the other hand, a different concept places its principal emphasis upon relationship of items to the operations, and to the year, excluding from the determination of net income any material extraordinary items which are not so related or which, if included, would impair the significance of net income so that misleading inferences might be drawn therefrom. This latter concept would require the income statement to be designed on what might be called a *current operating performance* basis, because its chief purpose is to aid those primarily interested in what a company was able to earn under the operating conditions of the period covered by the statement.

7. Proponents of the *all-inclusive* type of income statement
insist that annual income statements taken for the life of an enterprise should, when added together, represent total net income. They emphasize the dangers of possible manipulation of the annual earnings figure if material extraordinary items may be omitted in the determination of income. They also assert that, over a period of years, charges resulting from extraordinary events tend to exceed the credits, and the omission of such items has the effect of indicating a greater earning performance than the corporation actually has exhibited. They insist that an income statement which includes all income charges or credits arising during the year is simple to prepare, is easy to understand, and is not subject to variations resulting from the different judgments that may be applied in the treatment of individual items. They argue that when judgment is allowed to enter the picture with respect to the inclusion or exclusion of special items, material differences in the treatment of borderline cases develop and that there is danger that the use of *distortion* as a criterion may be a means of accomplishing the equalization of income. With full disclosure of the nature of any special or extraordinary items, this group believes the user of the financial statements can make his own additions or deductions more effectively than can the management or the independent accountant.

8. Those who favor the *all-inclusive* income statement largely
assume that those supporting the *current operating performance* concept are mainly concerned with establishing a figure of net

income for the year which will carry an implication as to future earning capacity. Having made this assumption, they contend that income statements should not be prepared on the *current operating performance* basis because income statements of the past are of only limited help in the forecasting of the earning power of an enterprise. This group also argues that items reflecting the results of unusual or extraordinary events are part of the earnings history of the company, and accordingly should be given weight in any effort to make financial judgments with respect to the company. Since a judgment as to the financial affairs of an enterprise should involve a study of the results of a period of prior years, rather than of a single year, this group believes that the omission of material extraordinary items from annual income statements is undesirable since there would be a greater tendency for those items to be overlooked in such a study.

9. On the other hand, those who advocate the *current operating performance* type of income statement generally do so because they are mindful of the particular business significance which a substantial number of the users of financial reports attach to the income statement. They point out that, while some users of financial reports are able to analyze a statement and eliminate from it those unusual and extraordinary items that tend to distort it for their purposes, many users are not trained to do so. Furthermore, they contend, it is difficult at best to report in any financial statement sufficient data to afford a sound basis upon which the reader who does not have an intimate knowledge of the facts can make a well-considered classification.
They consider it self-evident that management and the independent auditors are in a better position than outsiders to determine whether there are unusual and extraordinary items which, if included in the determination of net income, may give rise to misleading inferences as to current operating performance. Relying on the proper exercise of professional judgment, they discount the contention that neither managements nor the independent auditors, because of the absence of objective standards to guide them, have been able to decide consistently which extraordinary charges and credits should be excluded in determining earning performance. They agree it is hazardous to place too great a reliance on the net income as shown in a single annual statement and insist that a realistic presentation of current performance must be taken for what it is and should not be construed as conveying an implication as to future accomplishments. The net income of a single year is only one of scores of factors involved in analyzing the future earnings prospects or potentialities of a business. It is well recognized that future earnings are dependent to a large extent upon such factors as market trends, product developments, political events, labor relationships, and numerous other factors not ascertainable from the financial statements. However, this group insists that the net income for the year should show as clearly as possible what happened in that year under that year's conditions, in order that sound comparisons may be made with prior years and with the performance of other companies.

10. The advocates of this *current operating performance* type of statement join fully with the so-called *all-*

*inclusive* group
    in asserting that there should be full disclosure of all material
    charges or credits of an unusual character, including those
    attributable to a prior year, but they insist that disclosure
    should be made in such manner as not to distort the figure which
    represents what the company was able to earn from its usual or
    typical business operations under the conditions existing during
    the year. They point out that many companies, in order to give
    more useful information concerning their earning performance,
    make a practice of restating the earnings of a number of prior
    years after adjusting them to reflect the proper allocation of
    items not related to the years in which they were first reported.
    They believe that material extraordinary charges or credits may
    often best be disclosed as direct adjustments of surplus. They
    point out that a charge or credit in a material amount
    representing an unusual item not likely to recur, if included in
    the computation of annual net income, may be so distorting in its
    results as to lead to unsound judgments with respect to the
    current earning performance of the company.

    11. The committee has indicated elsewhere
[fn1] that in its opinion
    it is plainly desirable that over the years all profits and losses
    of a business be reflected in net income, but at the same time
    has recognized that, under appropriate circumstances, it is
    proper to exclude certain material charges and credits from
    the determination of the net income of a single year, even
    though they clearly affect the cumulative total of income for
    a series of years. In harmony with this view, **it is the opinion of
    the committee that there should be a general presumption
    that all items of profit and loss recognized during the
    period are to be used in determining the figure reported
    as net income. The only possible exception to this presumption
    relates to items which in the aggregate are material in
    relation to the company's net income and are clearly not
    identifiable with or do not result from the usual or typical
    business operations of the period.** Thus, only extraordinary
    items such as the following may be excluded from the
    determination of net income for the year, and they should be
    excluded when their inclusion would impair the significance of
    net income so that misleading inferences might be drawn
    therefrom:
[fn2]

    [fn1] See chapter 2
(b), paragraph 3.

    [fn2] See chapter 10
(b) with respect to the allocation of income taxes.

    a. Material charges or credits (other than ordinary
       adjustments of a recurring nature) specifically related
       to operations of prior years, such as the elimination of
       unused reserves provided in prior years and adjustments
       of income taxes for prior years;

    b. Material charges or credits resulting from unusual
       sales of assets not acquired for resale and not of the
       type in which the company generally deals;

   c. Material losses of a type not usually insured against,
      such as those resulting from wars, riots, earthquakes,
      and similar calamities or catastrophes except where such
      losses are a recurrent hazard of the business;

   d. The write-off of a material amount of intangibles;
[fn3]

   e. The write-
off of material amounts of unamortized bond
      discount or premium and bond issue expenses at the time
      of the retirement or refunding of the debt before
      maturity.

   [fn3] See chapter 5, paragraphs 8 and 9, for conditions under which a
   material portion or the entire amount of intangibles
   described therein as type (b) may be written off.

   12. The following, however, should be excluded from the
   determination of net income under all circumstances:

   a. Adjustments resulting from transactions in the
      company's own capital stock;

   b. Amounts transferred to and from accounts properly
      designated as surplus appropriations, such as charges
      and credits with respect to general purpose contingency
      reserves;

   c. Amounts deemed to represent excessive costs of fixed
      assets, and annual appropriations in contemplation of
      replacement of productive facilities at higher price
      levels;
[fn4] and

   d. Adjustments made pursuant to a quasi-
reorganization.

   [fn4] See chapter 9
(a) and dissents thereto.

   13. Consideration has been given to the methods of presentation
   of the extraordinary items excluded in the determination of net
   income under the criteria set forth in paragraph 11. One method
   is to carry all such charges and credits directly to the surplus
   account with complete disclosure as to their nature and amount. A
   second method is to show them in the income statement after the
   amount designated as net income. Where the second method is used,
   misconceptions are likely to arise as to whether earnings for the
   period are represented by the amount actually designated as net
   income or by the final, and often more prominent, amount shown on
   the income statement after deduction or addition of material
   extraordinary items excluded from the determination of net
   income. Having in mind the possibility of such misconceptions
   where the second method is employed, the committee believes that
   the first method more clearly portrays net income. It should be
   noted that the Securities and Exchange Commission, in its revised
   Regulation S-
X issued in December, 1950, made provision in item
   17 of Rule 5-

03 for the addition to or deduction from net income
  or loss, at the bottom of income statements filed with the
  Commission, of items of profit and loss given recognition in the
  accounts during the period and not included in the determination
  of net income or loss. The change in Rule 5-
03 does not affect
  the determination of the amount to be reported as net income or
  earnings for the year. Furthermore, the additions or deductions
  at the foot of the income statement after determination of net
  income are equivalent to direct credits or charges to earned
  surplus. In view of the foregoing, and although the committee
  strongly prefers the first method, it considers the second method
  of presentation described above to be acceptable provided care is
  taken that the figure of net income is clearly and unequivocally
  designated so as not to be confused with the final figure in the
  income statement. Thus it is imperative that the caption of the
  final figure should precisely describe what it represents, e.g.,
  *net income and special items, net income and refund of 1945
  excess profits taxes, net loss and special items,* or *profit on
  sale of subsidiary less net loss*. A company may use the first
  method of presentation in one statement and the second method in
  another like statement covering the same fiscal period. The
  committee wishes to make clear that neither of the above-
described methods of presentation precludes the use of the
  combined statement of income and earned surplus.
[fn5] However,
  where such combined statement is utilized, the committee's
  preference is that the figure of net income be followed
  immediately by the surplus balance at the beginning of the
  period. It is also the committee's opinion that deduction of
  the single item of dividends from net income on the income
  statement would not be subject to misconception.

  [fn5] See chapter 2
(b).

  14. In its deliberations concerning the nature and purpose of
  the income statement, the committee has been mindful of the
  disposition of even well-
informed persons to attach undue
  importance to a single net income figure and to *earnings per
  share* shown for a particular year. The committee directs
  attention to the undesirability in many cases of the
  dissemination of information in which major prominence is given
  to a single figure of *net income* or *net income per share*.
  However, if such income data are reported (as in newspapers,
  investors' services, and annual corporate reports), the committee
  strongly urges that any determination of *income per share* be
  related to the amount designated in the income statement as net
  income and that where material extraordinary charges or credits
  have been excluded from the determination of net income, the
  corresponding total or per-
share amount of such charges and
  credits also be reported separately and simultaneously. In this
  connection the committee earnestly solicits the cooperation of
  all organizations, both governmental and private, engaged in the
  compilation of business earnings statistics from annual reports.

**Chapter 9: DEPRECIATION**

**Section A  --**
**Depreciation and High Costs**

1. In December, 1947, the committee issued Accounting Research Bulletin No. 33, dealing with the subject of depreciation and high costs. In October, 1948, it published a letter to the membership reaffirming the opinion expressed in the bulletin.

2. The subject is one of continuing importance. The committee once more expresses its approval of the basic conclusions asserted in both publications, but in view of the many requests received for further consideration of various aspects of the problem has placed the subject on its agenda for further study.

3. Accounting Research Bulletin No. 33 read as follows:

4. "The American Institute of Accountants committee on accounting procedure has given extensive consideration to the problem of making adequate provision for the replacement of plant facilities in view of recent sharp increases in the price level. The problem requires consideration of charges against current income for depreciation of facilities acquired at lower price levels.

5. "The committee recognizes that business management has the responsibility of providing for replacement of plant and machinery. It also recognizes that, in reporting profits today, the cost of material and labor is reflected in terms of `inflated' dollars while the cost of productive facilities in which capital was invested at a lower price level is reflected in terms of dollars whose purchasing power was much greater. There is no doubt that in considering depreciation in connection with product costs, prices, and business policies, management must a take into consideration the probability that plant and machinery will have to be replaced at costs much greater than those of the facilities now in use.

6. "When there are gross discrepancies between the cost and current values of productive facilities, the committee believes that it is entirely proper for management to make annual appropriations of net income or surplus in contemplation of replacement of such facilities at higher price levels.

7. "It has been suggested in some quarters that the problem be met by increasing depreciation charges against current income. The committee does not believe that this is a satisfactory solution at this time. It believes that accounting and financial reporting for general use will best serve their purposes by adhering to the generally accepted concept of depreciation on cost, at least until the dollar is stabilized at some level. An attempt to recognize current prices in providing depreciation, to be consistent, would require the serious step of formally recording appraised current values for all properties, and continuous and consistent depreciation charges based on the new values. Without such formal steps, there would be no objective standard by which to judge the propriety of the amounts of depreciation charges against current income, and the significance of recorded amounts of profit might be seriously impaired.

8. "It would not increase the usefulness of reported corporate income figures if some companies charged depreciation on appraised values while others adhered to cost. The committee believes, therefore, that consideration of radical changes in accepted accounting procedure should not be undertaken, at least until a stable price level would make it practicable for business as a whole to make the change at the same time.

9. "The committee disapproves immediate writedowns of plant cost by charges against current income in amounts believed to represent excessive or abnormal costs occasioned by current price levels. However, the committee calls attention to the fact that plants expected to have less than normal useful life can properly be depreciated on a systematic basis related to economic usefulness."

10. The letter of October 14, 1948, was addressed to the members of the Institute and read as follows:

11. "The committee on accounting procedure has reached the conclusion that no basic change in the accounting treatment of depreciation of plant and equipment is practicable or desirable under present conditions to meet the problem created by the decline in the purchasing power of the dollar.

12. "The committee has given intensive study to this problem and has examined and discussed various suggestions which have been made to meet it. It has solicited and considered hundreds of opinions on this subject expressed by businessmen, bankers, economists, labor leaders, and others. While there are differences of opinion, the prevailing sentiment in these groups is against any basic change in present accounting procedures. The committee believes that such a change would confuse readers of financial statements and nullify many of the gains that have been made toward clearer presentation of corporate finances.

13. "Should inflation proceed so far that original dollar costs lose their practical significance, it might become necessary to restate all assets in terms of the depreciated currency, as has been done in some countries. But it does not seem to the committee that such action should be recommended now if financial statements are to have maximum usefulness to the greatest number of users.

14. "The committee, therefore, reaffirms the opinion it expressed in Accounting Research Bulletin No. 33, December, 1947.

15. "Any basic change in the accounting treatment of depreciation should await further study of the nature and concept of business income.

16. "The immediate problem can and should be met by financial management. The committee recognizes that the common forms of financial statements may permit misunderstanding as to the amount which a corporation has available for distribution in the form of dividends, higher wages, or lower prices for the company's products. When prices have risen appreciably since original investments in plant and facilities were made, a substantial proportion of net income as currently reported must be reinvested in the business in order to maintain assets at the same level of

productivity at the end of a year as at the beginning.

17. "Stockholders, employees, and the general public should be informed that a business must be able to retain out of profits amounts sufficient to replace productive facilities at current prices if it is to stay in business. The committee therefore gives its full support to the use of supplementary financial schedules, explanations or footnotes by which management may explain the need for retention of earnings."

Dissent

   *Six members of the committee, Messrs. Andrews, Peloubet, Peoples, Smith, Wellington, and Williams, dissented to adoption of section A of chapter 9.*

   The six dissenting members object to the reprinting, in this section, of Bulletin No. 33 of December, 1947, and the reaffirming letter of October 14, 1948. That bulletin was issued to check the extension of certain then-emerging practices and it was successful in that purpose. However, Bulletin No. 33 contains assertions which are not now appropriate and should be eliminated, notably:

       a. "An attempt to recognize current prices in providing depreciation . . . would require the serious step of formally recording appraised current values . . . and consistent depreciation charges based on the new values" (par. 7 of this section).

   Those dissenting believe this is not the only method which may be followed --
 a conclusion also reached by the Study Group on Business Income (see page 61 of its report).
[fn1]

       b. ". . . consideration of radical changes in accepted accounting procedure should not be undertaken, at least until a stable price level would make it practicable for business as a whole to make the change at the same time." (par. 8)

   This statement virtually precludes changes in accounting practice in so far as the monetary unit is concerned and is inconsistent with the paragraphs on Accounting and the Corporate System in the introduction to this volume.

       c. The warnings (in paragraphs 5, 6, 16 and 17) to management as to the use of profits.

   Such warnings are irrelevant; it is no part of the accountant's function to tell management what it may or may not properly do with income after it has been determined.

   Those dissenting believe that acceptable accounting practices should comprehend financial statements to stockholders, employees, and the public designed to

reflect those concepts of cost and net income which are recommended in paragraph 5 to management in determining product costs, prices, and business policies. They question whether net income can properly be so designated if appropriations therefrom, as suggested in paragraph 6, are needed to preserve capital invested in plant.

They believe that plant may continue to be carried in the balance sheet at historical cost with deduction for depreciation based thereon. In addition to historical depreciation, a supplementary annual charge to income should be permitted with corresponding credit to an account for property replacements and substitutions, to be classified with the stockholders' equity. This supplementary charge should be in such amount as to make the total charge for depreciation express in current dollars the exhaustion of plant allocable to the period. The supplementary charge would be calculated by use of a generally accepted price index applied to the expenditures in the years when the plant was acquired. The last sentence of paragraph 7 would then be no longer valid; the usefulness of financial statements would be enhanced without sacrifice of presently existing comparability.

[fn1] Study Group on Business Income, *Changing Concepts of Business Income*, New York: The Macmillan Co., 1952, 160pp.

**Section B  --**
**Depreciation on Appreciation**

1. Historically, fixed assets have been accounted for on the basis of cost. However, fixed assets in the past have occasionally been written up to appraised values because of rapid rises in price levels, to adjust costs in the case of bargain purchases, etc. In some of these instances companies have continued to compute depreciation on the basis of cost.

2. When appreciation has been entered on the books income should be charged with depreciation[fn1] computed on the written-up
amounts. A company should not at the same time claim larger property valuations in its statement of assets and provide for the amortization of only smaller amounts in its statement of income. When a company has made representations as to an increased valuation of plant, depreciation accounting and periodic income determination thereafter should be based on such higher amounts.

[fn1] The word *depreciation* is here used in its ordinary accounting sense and not as the converse of *appreciation*.

*Three members of the committee, Messrs. Calkins, Lindquist, and Mason, assented with qualification to adoption of section B of chapter 9.*

Messrs. Calkins, Lindquist, and Mason believe that, as a matter of consistency, where increased property

valuations have been entered on the books the credit
item should be treated as permanent capital and would
therefore not be available for subsequent transfer to
earned surplus as *realized* through depreciation or
sale.

**Section C --**
**Emergency Facilities: Depreciation, Amortization**
**and Income Taxes**

**Certificates of Necessity**

1. Section 124A of the Internal Revenue Code, which was added by
the Revenue Act of 1950, provides for the issuance of
certificates of necessity under which all or part of the cost of
so-
called *emergency facilities* may be amortized over a period
of 60 months for income-
tax purposes. In many cases, the amounts
involved are material, and companies are faced with the problem
of deciding whether to adopt the 60-
month period over which the
portions of the cost of the facilities covered by certificates of
necessity may be amortized for income-
tax purposes as the period
over which they are to be depreciated in the accounts.

2. Thinking on this question apparently has become confused
because many so-
called *percentage certificates* have been issued
covering less than the entire cost of the facility. This fact,
together with the fact that the probable economic usefulness of
the facility after the close of the five-
year amortization period
is considered by the certifying authority in determining the
percentage covered by these certificates, has led many to believe
that the percentage used represents the government's conclusion
as to the proportion of the cost of the facility that is not
expected to have usefulness at the end of five years.

3. In some cases, it is apparent that the probable lack of
economic usefulness of the facility after the close of the
amortization period must constitute the principal if not the sole
basis for determining the percentage to be included in the
certificate. However, it must be recognized that the certifying
authority has acted under orders to give consideration also to a
variety of other factors to the end that the amount certified may
be the minimum amount necessary to secure expansion of industrial
capacity in the interest of national defense during the emergency
period. Among the factors required to be considered in the
issuance of these certificates, in addition to loss of useful
value, are (a) character of business, (b) extent of risk assumed
(including the amount and source of capital employed, and the
potentiality of recovering capital or retiring debt through tax
savings or pricing), (c) assistance to small business and
promotion of competition, (d) compliance with government policies
(e.g., dispersal for security), and (e) other types of incentives
provided by government, such as direct government loans,
guaranties, and contractual arrangements.

**Depreciation Considerations**

4. The argument has been advanced from time to time that, since the portion of the cost of properties covered by certificates of necessity is amortized over a five-year period for income-tax purposes, it is necessary to follow the same procedure in the accounts. Sound financial accounting procedures do not necessarily coincide with the rules as to what shall be included in "gross income," or allowed as a deduction therefrom, in arriving at taxable net income. It is well recognized that such rules should not be followed for financial accounting purposes if they do not conform to generally accepted accounting principles. However, where the results obtained from following income-tax procedures do not materially differ from those obtained where generally accepted accounting principles are followed, there are practical advantages in keeping the accounts in agreement with the income-tax returns.

5. The cost of a productive facility is one of the costs of the services it renders during its useful economic life. Generally accepted accounting principles require that this cost be spread over the expected useful life of the facility in such a way as to allocate it as equitably as possible to the periods during which services are obtained from the use of the facility. This procedure is known as depreciation accounting, a system of accounting which aims to distribute the cost or other basic value of tangible capital assets, less salvage (if any), over the estimated useful life of the unit (which may be a group of assets) in a systematic and rational manner. It is a process of allocation, not of valuation.

6. The committee is of the opinion that from an accounting standpoint there is nothing inherent in the nature of emergency facilities which requires the depreciation or amortization of their cost for financial accounting purposes over either a shorter or a longer period than would be proper if no certificate of necessity had been issued. Estimates of the probable useful life of a facility by those best informed in the matter may indicate either a shorter or a longer life than the statutory 60-month period over which the certified portion of its cost is deductible for income-tax purposes.

7. In determining the proper amount of annual depreciation with respect to emergency facilities for financial accounting purposes, it must be recognized that a great many of these facilities are being acquired primarily for what they can produce during the emergency period. To whatever extent it is reasonable to expect the useful economic life of a facility to end with the close of the amortization period the cost of the facility is a proper cost of operation during that period.

8. In determining the prospective usefulness of such facilities it will be necessary to consider their adaptability to post-

emergency use, the effect of their use upon economic
  utilization of other facilities, the possibility of excessive
  costs due to expedited construction or emergency conditions, and
  the fact that no deductions for depreciation of the certified
  portion will be allowable for income-
tax purposes in the
  post-
amortization years if the company elects to claim the
  amortization deduction. The purposes for which emergency
  facilities are acquired in a great many cases are such as to
  leave major uncertainties as to the extent of their use during
  the amortization period and as to their subsequent
  usefulness  --
 uncertainties which are not normally encountered in
  the acquisition and use of operating facilities.

  9. Consideration of these factors, the committee believes, will
  in many cases result in the determination of depreciation charges
  during the amortization period in excess of the depreciation that
  would be appropriate if these factors were not involved.
  Frequently they will be so compelling as to indicate the need for
  recording depreciation of the cost of emergency facilities in the
  accounts in conformity with the amortization deductions allowable
  for income-
tax purposes. However, the committee believes that
  when the amount allowed as amortization for income-
tax purposes
  is materially different from the amount of the estimated
  depreciation, the latter should be used for financial accounting
  purposes.

  10. In some cases, certificates of necessity cover facilities
  which the owner expects to use after the emergency period in lieu
  of older facilities. As a result the older facilities may become
  unproductive and obsolete before they are fully depreciated on
  the basis of their previously expected life. In such situations,
  the committee believes depreciation charges to income should be
  determined in relation to the total properties, to the end that
  sound depreciation accounting may be applied to the property
  accounts as a whole.

  **Recognition of Income Tax Effects**

  11. In those cases in which the amount of depreciation charged
  in the accounts on that portion of the cost of the facilities for
  which certificates of necessity have been obtained is materially
  less than the amount of amortization deducted for income-
tax
  purposes, the amount of income taxes payable annually during the
  amortization period may be significantly less than it would be on
  the basis of the income reflected in the financial statements. In
  such cases, after the close of the amortization period the income
  taxes will exceed the amount that would be appropriate on the
  basis of the income reported in the statements. Accordingly, the
  committee believes that during the amortization period, where
  this difference is material, a charge should be made in the
  income statement to recognize the income tax to be paid in the
  future on the amount by which amortization for income-
tax
  purposes exceeds the depreciation that would be allowable if

certificates of necessity had not been issued. The amount of the charge should be equal to the estimated amount by which the income tax expected to be payable after the amortization period exceeds what would be so expected if amortization had not been claimed for income-
tax purposes in the amortization period. The
estimated amount should be based upon normal and surtax rates in effect during the period covered by the income statement with such changes therein as can be reasonably anticipated at the time the estimate is made.

12. In accounting for this deferment of income taxes, the committee believes it desirable to treat the charge as being for additional income taxes. The related credit in such cases would properly be made to an account for deferred income taxes. Under this method, during the life of the facility following the amortization period the annual charges for income taxes will be reduced by charging to the account for deferred income taxes that part of the income tax in excess of what would have been payable had the amortization deduction not been claimed for income-
tax
purposes in the amortization period. By this procedure the net income will more nearly reflect the results of a proper matching of costs and revenues.

13. There are those who similarly recognize the necessity for giving effect to the amount of the deferred income taxes but who believe this should be accomplished by making a charge in the income account for additional amortization or depreciation. They would carry the related credit to an accumulated amortization or depreciation account as a practical means of recognizing the loss of future deductibility of the cost of the facility for income-
tax purposes. If this procedure is followed the annual
charges for depreciation will be correspondingly reduced throughout the useful life of the facility following the amortization period. Although this procedure will result in the same amount of net income as the procedure outlined in paragraph 12, and therefore may be considered as acceptable, the committee regards the paragraph 12 procedure as preferable. In any circumstances, there should be disclosure of the procedures followed.

**Chapter 10: TAXES**

**Section A  --**
**Real and Personal Property Taxes**

1. The purpose of this section is to draw attention to the problems involved in accounting for real and personal property taxes and to present some of the considerations which enter into a determination of their accounting treatment.

**Legal Liability for Property Taxes and Treatment for Income-**
**Tax Purposes**

2. Unlike excise, income, and social security taxes, which are directly related to particular business events, real and personal property taxes are based upon the assessed valuation of property (tangible and intangible) as of a given date, as determined by

the laws of a state or other taxing authority. For this reason
the legal liability for such taxes is generally considered as
accruing at the moment of occurrence of some specific event,
rather than over a period of time. Whether such legal accrual
should determine the accounting treatment is a question to be
discussed later. Tax laws, opinions of attorneys, income-
tax
regulations, and court decisions have mentioned various dates on
which certain property taxes are said to accrue legally. Among
them are the following:

a. Assessment date,
b. Beginning of taxing authority's fiscal year,
c. End of taxing authority's fiscal year,
d. Date on which tax becomes a lien on the property,
e. Date tax is levied,
f. Date or dates tax is payable,
g. Date tax becomes delinquent,
h. Tax period appearing on tax bill.

3. Most of the foregoing dates are mentioned in tax laws. In a
given case several of these dates may coincide.

4. The date to be applied in a particular case necessarily
requires reference to the law and court decisions of the state
concerned. Where the matter has been litigated, it has often been
held that property taxes become a liability at the point of time
when they become a lien. The general rule, however, is that such
taxes accrue as of the date on which they are assessed. The
position of the Bureau of Internal Revenue is that generally
property taxes accrue on the assessment date, even if the amount
of the tax is not determined until later.

5. A practical aspect of the legal liability for property taxes
must be considered when title to property is transferred during
the taxable year. As stated above, the assessment date generally
determines accrual. But as between vendor and vendee, the Supreme
Court
[fn1] has laid down the rule that the lien date, or the date
of personal obligation, controls and that where a transfer occurs
after either of those dates, the purchaser is not entitled to
deduct the taxes for income-
tax purposes.

   [fn1] *Magruder v. Supplee*, 316 U.S. 394 (1942).

6. Adjustments on account of property taxes paid or accrued are
frequently incorporated in agreements covering the sale of real
estate, which determine the question for the individual case as
between the buyer and seller, though they are not necessarily
controlling for income-
tax purposes.

7. Although pro-
rata accrual of property taxes has been
permitted by some courts, the generally accepted rule seems to be
that such taxes accrue in a lump sum on one date and not ratably
over the year.

**Accounting for Property Taxes**

*Accrual accounting*

8. Accounting questions arise as to (1) when the liability for real and personal property taxes should be recorded on the books of a taxpayer keeping his accounts on the accrual basis and (2) the amounts to be charged against the income of respective periods. Here again, the decision is influenced by the particular circumstances of each tax. Such terms as *assessment date* and *levy date* vary in meaning in the different jurisdictions; and while there is sufficient agreement about assessment date to furnish a basis for the general legal rule already mentioned, it does not necessarily follow that the legal rule should determine the accounting treatment.

9. Determination of the liability for the tax often proceeds by degrees, the several steps being taken at appreciable intervals of time. For example, while it is known that the owner of real property is liable, with respect to each tax period, for a tax on property owned on the assessment date, the amount of the tax may not be fixed until much later. There is sometimes reluctance toward recording liabilities of indeterminate amount, especially such items as property taxes, and a preference for recording them when the amount can be computed with certainty. While this consideration is one which occasionally leads to the mention of taxes in footnotes as contingent liabilities, the inability to determine the exact amount of taxes is in itself no justification for failure to recognize an existing tax liability.

10. In practice, real and personal property taxes have been charged against the income of various periods, as indicated below:

a. Year in which paid (cash basis),
b. Year ending on assessment (or lien) date,
c. Year beginning on assessment (or lien) date,
d. Calendar or fiscal year of taxpayer prior to assessment (or lien) date,
e. Calendar or fiscal year of taxpayer including
   assessment (or lien) date,
f. Calendar or fiscal year of taxpayer prior to payment date,
g. Fiscal year of governing body levying the tax,
h. Year appearing on tax bill.

11. Some of these periods may coincide, as when the fiscal year of the taxing body and that of the taxpayer are the same. The charge to income is sometimes made in full at one time, sometimes ratably on a monthly basis, sometimes on the basis of prior estimates, adjusted during or after the period.

12. The various periods mentioned represent varying degrees of conservatism in accrual accounting. Some justification may be found for each usage, but all the circumstances relating to a particular tax must be considered before a satisfactory conclusion is reached.

13. Consistency of application from year to year is the important consideration and selection of any of the periods mentioned is a matter for individual judgment.

*Basis considered most acceptable*

14. Generally, the most acceptable basis of providing for property taxes is monthly accrual on the taxpayer's books during the fiscal period of the taxing authority for which the taxes are levied. The books will then show, at any closing date, the appropriate accrual or prepayment.

15. It may be argued that the entire amount of tax should logically be accrued by the lien date. Advocates of this procedure vary from those who would accrue the tax by charges to income during the year ending on the lien date, to those who urge setting up the full tax liability on the lien date and charging the amount thereof to income during the subsequent year. However, the basis described in the preceding paragraph is held by the majority of accountants to be practical and satisfactory so long as it is consistently followed.

**Treatment in Financial Statements**

***Balance sheet***

16. An accrued liability for real and personal property taxes, whether estimated or definitely known, should be included among the current liabilities. Where estimates are subject to a substantial measure of uncertainty the liability should be described as estimated.

***Income statement***

17. While it is sometimes proper to capitalize in property accounts the amount of real estate taxes applicable to property which is being developed for use or sale, these taxes are generally regarded as an expense of doing business. They may be (a) charged to operating expenses; (b) shown as a separate deduction from income; or (c) distributed among the several accounts to which they are deemed to apply, such as factory overhead, rent income, and selling or general expenses.

18. In condensed income statements appearing in published reports, the amounts of real and personal property taxes, however charged in the accounts, are rarely shown separately. They are frequently combined with other taxes but not with taxes on income.

19. Since the liability for property taxes must frequently be estimated at the balance-
sheet date, it is often necessary to
adjust the provision for taxes of a prior year when their amount has been ascertained. These adjustments should ordinarily be made through the income statement, either in combination with the current year's provision or as a separate item in the income statement. Such adjustments should not be made in the surplus account, except under the conditions set forth in chapter 8, paragraphs 11, 12, and 13.

Assent

 *One member of the committee, Mr. Wellington, assented with qualification to adoption of section A of chapter 10.*

Mr. Wellington objects to the statement in paragraph 15 that the basis described in paragraph 14 is held by the majority of accountants to be practical and satisfactory so long as it is consistently followed. In his opinion, the most logical practice is to accrue the entire amount of tax at the lien date, with a corresponding charge to an account such as *taxes unexpired* which will then be reduced pro rata, as outlined in the latter part of the second sentence of paragraph 15.

**Section B --**
**Income Taxes**

1. This section deals with a number of accounting problems which arise in the reporting of income and excess-profits taxes
(hereinafter referred to as income taxes) in financial statements. The problems arise largely where (a) material items entering into the computation of taxable income are not included in the income statement and where (b) material items included in the income statement do not enter into the computation of taxable income. The section does not apply where there is a presumption that particular differences between the tax return and the income statement will recur regularly over a comparatively long period of time.

2. Basic difficulties arise in connection with the accounting for income taxes where there are material and extraordinary differences between the taxable income upon which they are computed and the income for the period determined in accordance with generally accepted accounting principles. For example, provisions may be made in the income statement for possible losses not yet realized but requiring recognition under generally accepted accounting principles, such losses, however, being deductible for tax purposes only when they occur. On the other hand, deductions may be taken in the tax return which are not included in the income statement, such as charges against an estimated liability account created in a prior period. Likewise, gains subject to income tax may not be included in the income statement, as, for instance, a gain on the sale of property credited to surplus. Also, credits in the income statement may not be includible in taxable income, as when an unneeded past provision for an estimated liability is restored to income.

3. In some cases the transactions result in gains; in others they result in losses or net costs. If all the effects of the transactions (including their effect on income tax) were reflected in the income statement the income would, of course, be increased where the transactions result in a gain and reduced where they result in a loss or net cost. But where the effects are not all reflected in the income statement, and that statement indicates only the income tax actually payable, exactly the opposite effect is produced  --
where the special transactions
result in a gain the net income is reduced; and where they result in a loss, or net cost, the net income is increased. Such results ordinarily detract from the significance or usefulness of the financial statements.

4. Financial statements are based on allocations of receipts, payments, accruals, and various other items. Many of the allocations are necessarily based on assumptions, but no one suggests that allocations based on imperfect criteria should be abandoned in respect of expenses other than income taxes, or even that the method of allocation should always be indicated. Income taxes are an expense that should be allocated, when necessary and practicable, to income and other accounts, as other expenses are allocated. What the income statement should reflect under this head, as under any other head, is the expense properly allocable to the income included in the income statement for the year.

5. In cases in which transactions included in the surplus statement but not in the income statement increase the income tax payable by an amount that is substantial and is determinable without difficulty, as in the case of a gain credited to surplus, an allocation of income tax between the two statements would ordinarily be made. Objection to allocation in other cases, as where a loss is charged to surplus, has been made on the ground that the amount shown for income taxes in the income statement would be increased beyond the amount of the tax estimated to be actually payable. Further objection has been made on the ground that the amount attributable to accounts other than income is not reasonably determinable.

6. The committee sees no objection to an allocation which results in the division of a given item into two parts one of which is larger than the item itself and is offset by the smaller. The argument that the effect of the special transactions on the amount of tax is not identifiable is usually without substantial merit. The difficulties encountered in allocation of the tax are not greater than those met with in many other allocations of expenses. The allocation procedure recommended here does not, of course, contemplate a determination of the tax effect attributable to every separate transaction. In the committee's view, all that is necessary in making an allocation is to consider the effect on taxes of those special transactions which are not included in the income statement.

7. The cases that are likely to call for allocation are those in which transactions affecting the income tax in a manner which would have a distorting effect on net income are included in (a) surplus accounts, (b) deferred-charge accounts, or (c) estimated liability and similar accounts. Methods of applying the allocation principle in these instances are set forth below.

**Methods of Applying the Allocation Principle**

*Computation of tax effect*

8. In most cases, it is appropriate to consider the tax effect as the difference between the tax payable with and without including the item in the amount of taxable income. In certain cases the tax effect attributable to a particular transaction for the purposes indicated above may be computed directly as in the case of transactions subject to the capital gains tax. There may also be cases in which it will be appropriate to use a current over-all effective rate or, as in the case of deferred income, an

estimated future tax rate. The estimated rate should be based upon normal and surtax rates in effect during the period covered by the income statement with such changes therein as can be reasonably anticipated at the time the estimate is made.

### Credits to surplus

9. Where an item resulting in a material increase in income taxes is credited to surplus, the portion of the provision for income taxes which is attributable to such item should, under the principle of allocation, be charged thereto. The committee suggests, however, that the provision for income taxes estimated as due be shown in the income statement in full and that the portion thereof charged to surplus be shown on the income statement either (a) as a separate deduction from the actual tax or (b) as a separate credit, clearly described.

### Charges to surplus

10. Where an item resulting in a material reduction in income taxes is charged to surplus, the principle of allocation may be applied in the income statement in either of two ways: (a) the provision for income taxes may be shown as if the item in question were not deductible (the total amount of tax estimated to be due for the year being indicated) or (b) a special charge representing the portion of such item equal to the tax reduction resulting therefrom may be separately shown. In either case the amount charged to surplus is reduced accordingly.

### Deferred-charge and estimated liability accounts

11. The principle of allocation applies also where an item resulting in a material reduction in income taxes is charged to or carried forward in a deferred-charge account or charged to an estimated liability account.

12. The deduction for tax purposes in a given year of an item which is carried to or remains in a deferred-charge account will involve a series of charges in future income statements for amortization of the deferred charge, and these charges will not be deductible for tax purposes. In the period in which the item is taken as a deduction for tax purposes a charge should be made in the income statement of an amount equal to the tax reduction, in the manner set forth above with respect to charges to surplus, with a corresponding credit in the deferred-charge account. Thereafter amortization of the deferred charge should be based on the amount as adjusted by such tax reduction.

13. Where an item resulting in a material reduction in income taxes is charged to an estimated liability account the principle of allocation may be applied in the income statement in any of three ways: (a) the current provision for income taxes may be shown as if the item in question were not deductible (the total amount of tax estimated to be due for the year being indicated), or (b) a charge may be included for a portion of such item equal to the tax reduction resulting therefrom, or (c) the item in

question may be charged in the income statement and a credit made
in the income statement representing a portion of the estimated
liability account equal to the excess of such item over the
related tax reduction.

***Special treatment***

14. Where the treatments recommended above are considered to be
not practicable, the amount of taxes estimated to be actually
payable for the year may be shown in the income statement,
provided that the pertinent facts, including the amount of the
increase or decrease attributable to other accounts, are clearly
disclosed either in a footnote or in the body of the income
statement.

**Additional Taxes and Refunds**

15. Adjustments of provisions for income taxes of prior periods,
as well as any refunds and any assessments of additional amounts,
should be included in the income statement unless they are so
material as to have a distorting effect on net income;
[fn1] in such
event they may be charged or credited to surplus with indication as to
the period to which they relate.

[fn1] See chapter 8, paragraphs 11, 12, and 13.

**Carry-back of Losses and Unused Excess-
Profits Credits**

16. While claims for refund of income taxes ordinarily should
not be included in the accounts prior to approval by the taxing
authorities, a claim based on the carry-
back provisions of the
Internal Revenue Code presumably has as definite a basis as has
the computation of income taxes for the year. Therefore, amounts
of income taxes paid in prior years which are refundable to the
taxpayer as the result of the carry-
back of losses or unused
excess-
profits credits ordinarily should be included in the
income statement of the year in which the loss occurs or the
unused excess-
profits credit arises. Either of two treatments is
acceptable: (a) the amount of taxes estimated to be actually
payable for such year may be shown in the income statement, with
the amount of the tax reduction attributable to the amounts
carried back indicated either in a footnote or parenthetically in
the body of the income statement; or (b) the income statement may
indicate the results of operations without inclusion of such
reduction, which reduction should be shown as a final item before
the amount of net income for the period.

**Carry-forward of Losses and Unused Excess-
Profits Credits**

17. Where taxpayers are permitted to carry forward losses or
unused excess-
profits credits, the committee believes that, as a
practical matter, in the preparation of annual income statements

the resulting tax reduction should be reflected in the year to
which such losses or unused credits are carried. Either of two
treatments is acceptable: (a) the amount of taxes estimated to be
actually payable for such year may be shown in the income
statement, with the amount of the tax reduction attributable to
the amounts carried forward indicated either in a footnote or
parenthetically in the body of the income statement; or (b) the
income statement may indicate the results of operations without
inclusion of such reduction, which reduction should be shown as a
final item before the amount of net income for the period.
However, where it is believed that misleading inferences would be
drawn from such inclusion, the tax reduction should be credited
to surplus.

**Disclosure of Certain Differences between Taxable and Ordinary Income**

18. If, because of differences between accounting for tax and
accounting for financial purposes, no income tax has been paid or
provided as to certain significant amounts credited to surplus or
to income, disclosure should be made. However, if a tax is likely
to be paid thereon, provision should be made on the basis of an
estimate of the amount of such tax. This rule applies, for
instance, to profits on instalment sales or long-
term contracts
which are deferred for tax purposes, and to cases where
unrealized appreciation of securities is taken into the accounts
by certain types of investment companies.

Assent

   *Two members of the committee, Messrs. Wellington and
Werntz, assented with qualification to adoption of
section B of chapter 10.*

   Mr. Wellington objects to paragraph 17, as he believes
that the amount of the reduction in tax of the later
year is due to the operations of the prior year, is in
effect an adjustment of the net income or net loss
previously reported, and, unless it is relatively not
significant, should not be included in the income of the
current year but should be credited to surplus. In an
income statement for several years, he would show this
credit to surplus as an addition to the income
previously reported for the prior year, with suitable
explanation.

   Mr. Werntz does not agree with some of the reasoning,
particularly paragraph 6, and certain of the conclusions
contained in this section. While he believes that in
many cases a difference in treatment of items for tax
and financial purposes preferably requires a specialized
charge or credit in the income account, so that neither
a double benefit nor a double deduction results, he
believes that the charge or credit may not always be
mandatory and should ordinarily be described in terms of
the item involved rather than as *taxes*.

**Chapter 11: GOVERNMENT CONTRACTS**

**Section A  -- Cost-Plus-Fixed-**

**Fee Contracts**

1. This section deals with accounting problems arising under cost-plus-fixed-
fee contracts, hereinafter referred to as CPFF
contracts.

**Summary Statement**

2. Fees under CPFF contracts may be credited to income on the basis of such measurement of partial performance as will reflect reasonably assured realization. One generally acceptable basis is delivery of completed articles. The fees may also be accrued as they are billable, under the terms of the agreements, unless such accrual is not reasonably related to the proportionate performance of the total work or services to be performed by the contractor from inception to completion.

3. Where CPFF contracts involve the manufacture and delivery of products, the reimbursable costs and fees are ordinarily included in appropriate sales or other revenue accounts. Where such contracts involve only services, or services and the supplemental erection of facilities, only the fees should ordinarily be included in revenues.

4. Unbilled costs and fees under such contracts are ordinarily receivables rather than advances or inventory, but should preferably be shown separately from billed accounts receivable.

5. Offsetting of government advances on CPFF contracts by, or against, amounts due from the government on such contracts is acceptable only to the extent that the advances may under the terms of the agreement be offset in settlement, and only if that is the treatment anticipated in the normal course of business transactions under the contract. In case of offset, the amounts offset should be adequately disclosed.

**Discussion**

6. Contracts in the CPFF form are used (a) for the manufacture and delivery of various products, (b) for the construction of plants and other facilities, and (c) for management and other services. Under these agreements contractors are reimbursed at intervals for their expenditures and in addition are paid a specified fixed fee. Payments on account of the fees (less 10% or other amount which is withheld until completion) are made from time to time as specified in the agreements, usually subject to the approval of the contracting officer. In most cases the amount of each payment is, as a practical matter, determined by the ratio of expenditures made to the total estimated expenditures rather than on the basis of deliveries or on the percentage of completion otherwise determined.

7. The agreements provide that title to all material applicable thereto vests in the government as soon as the contractor is reimbursed for his expenditures or, in some cases, immediately upon its receipt by the contractor at his plant even though not yet paid for. The contractor has a custodianship responsibility for these materials, but the government usually has property accountability officers at the plant to safeguard government

interests.

8. The contracts are subject to cancellation and termination by the government, in which event the contractor is entitled to reimbursement for all expenditures made and an equitable portion of the fixed fee.

9. The government frequently makes advances of cash as a revolving fund or against the final payment due under the agreement.

### *Major accounting problems*

10. There are a number of basic accounting problems common to all CPFF contracts. This section deals with the four most important, which are:

a. When should fees under such contracts be included in the contractor's income statement?
b. What amounts are to be included in sales or revenue accounts?
c. What is the proper balance-sheet classification of unbilled costs and fees?
d. What is the proper balance-sheet treatment of various items, debit and credit, identified with CPFF contracts?

*a. When should fees under such contracts be included in the contractor's income statement?*

11. It is recognized that income should be recorded and stated in accordance with certain accounting principles as to time and amount; that profit is deemed to be realized when a sale in the ordinary course of business is effected unless the circumstances are such that collection of the sales price is not reasonably assured; and that delivery of goods sold under contract is normally regarded as the test of realization of profit or loss.

12. In the case of manufacturing, construction, or service contracts, profits are not ordinarily recognized until the right to full payment has become unconditional, i.e., when the product has been delivered and accepted, when the facilities are completed and accepted, or when the services have been fully and satisfactorily rendered. This accounting procedure has stood the test of experience and should not be departed from except for cogent reasons.

13. It is, however, a generally accepted accounting procedure to accrue revenues under certain types of contracts and thereby recognize profits, on the basis of partial performance, where the circumstances are such that total profit can be estimated with reasonable accuracy and ultimate realization is reasonably assured. Particularly where the performance of a contract requires a substantial period of time from inception to completion, there is ample precedent for pro-rata recognition of profit as the work progresses, if the total profit and the ratio of the performance to date to the complete performance can be computed reasonably and collection is reasonably assured. Depending upon the circumstances, such partial performance may be

established by deliveries, expenditures, or percentage of
completion otherwise determined. This rule is frequently applied
to long-
term construction and other similar contracts; it is also
applied in the case of contracts involving deliveries in
instalments or the performance of services. However, the rule
should be dealt with cautiously and not applied in the case of
partial deliveries and uncompleted contracts where the
information available does not clearly indicate that a partial
profit has been realized after making provision for possible
losses and contingencies.

14. CPFF contracts are much like the type of contracts upon
which profit has heretofore been recognized on partial
performance, and accordingly have at least as much justification
for accrual of fee before final delivery as those cited. The risk
of loss is practically negligible, the total profit is fairly
definite, and even on cancellation, pro-
rata profit is still
reasonably assured.

15. The basic problem in dealing with CPFF contracts is the
measure of partial performance, i.e., whether fees thereunder
should be accrued under the established rules as to partial
deliveries or percentage of completion otherwise determined, or
whether, in view of their peculiar terms with respect to part
payments, the determination of amounts billable by continuous
government audit, and the minimum of risk carried by the
contractor, the fees should be accrued as they are billable.

16. Ordinarily it is acceptable to accrue the fees as they
become billable. The outstanding characteristic of CPFF contracts
is reimbursement for all allowable costs, plus payment of a fixed
fee for the contractor's efforts. Delivery of the finished
product may not have its usual legal significance because title
passes to the government prior thereto and the contractor's right
to partial payment becomes unconditional in advance thereof;
deliveries are not necessarily, under the terms of the agreement,
evidence of the progress of the work or of the contractor's
performance. Amounts billable indicate reasonably assured
realization, possibly subject to renegotiation, because of the
absence of a credit problem and minimum risk of loss involved.
The fee appears to be earned when allowable costs are incurred or
paid and the fee is billable. Finally, accrual on the basis of
amounts billable is ordinarily not a departure from existing
rules of accrual on the basis of partial performance, but rather
a distinctive application of the rule for determining percentage
of completion.

17. Judgment must be exercised in each case as to whether
accrual of the fee when billable is preferable to accrual on the
usual basis of delivery or of percentage of completion otherwise
determined. While the approval of the government as to amounts
billable would ordinarily be regarded as objective evidence,
factors may exist which suggest an earlier or later accrual. Such
factors include indications of substantial difference between
estimated and final cost, as where preparatory or tooling-
up
costs were much more than estimated, raw material needs were
greatly and unduly anticipated by advance purchases, or delays in

delivery schedules or other circumstances suggest that costs are exceeding estimates. While such factors are normally considered by the government and billings for fees may be temporarily adjusted to safeguard against too early proportionate payment, the contractor, in accruing income, should also consider them, particularly when any substantial lag exists between expenditures and billings and audit thereof. In such cases, the presumption may be that the fee will not be found to be billable when the charges are presented, and conservatism in accrual will be necessary. Excess costs may be indicated in some cases to such an extent that accrual of fee before actual production would be unwise. Where such a situation exists the usual rule of deliveries or percentage of completion may be a preferable method of accruing the fee.

18. There are further questions as to whether the fee may be accrued as it is billed rather than as it becomes billable and whether accrual should be on the basis of the full fee or the full fee less the amount withheld. As to the first question, it seems obvious that when accrual in relation to expenditures is otherwise suitable it should be on the basis of amounts billable, since such matters as clerical delays in assembling data for billing should not affect the income statement. As to the second question, accrual on the basis of 100% of the fee is ordinarily preferable since, while payment of the balance depends on complete performance, such completion is to be expected under ordinary circumstances. Care must be exercised, of course, to provide for possible non-realization where there is doubt as to the collection of claimed costs or of the fee thereon.

*b. What amounts are to be included in sales or revenue accounts?*

19. This problem is whether sales or revenue as reported in the income statement should include reimbursable costs and the fee, or the fee alone. The answer to this question depends upon the terms of the contract and upon judgment as to which method gives the more useful information.

20. Some CPFF contracts are service contracts under which the contractor acts solely in an agency capacity, whether in the erection of facilities or the management of operations. These appear to call for inclusion in the income statement of the fee alone. In the case of supply contracts, however, the contractor is more than an agent. For instance, he is responsible to creditors for materials and services purchased; he is responsible to employees for salaries and wages; he ordinarily uses his own facilities in carrying out his agreement; his position in many respects is that of an ordinary principal. In view of these facts, and the desirability of indicating the volume of his activities, it appears desirable to include reimbursable costs, as well as fees, in sales or revenues.

*c. What is the proper balance-sheet classification of unbilled costs and fee?*

21. The principal reason for the existence of unbilled costs at any date is the time usually required, after receipt of material or expenditures for labor, etc., to assemble data for billing.

The right to bill usually exists upon expenditure or accrual, and that right unquestionably represents a receivable rather than an advance or inventory. There is nevertheless a difference in character between billed items and unbilled costs and distinction should be made between them on the balance sheet.

*d. What is the proper balance-*
*sheet treatment of various items,*
*debit and credit, identified with CPFF contracts?*

22. In statements of current assets and current liabilities, amounts due to and from the same person are ordinarily offset where, under the law, they may be offset in the process of collection or payment. An advance received on a contract is, however, usually not offset unless it is definitely regarded as a payment on account of contract work in progress, in which event it will be shown as a deduction from the related asset. An advance on a CPFF contract usually is made for the purpose of providing a revolving fund and is not ordinarily applied as a partial payment until the contract is completed or nears completion. It therefore appears to be preferable to offset advances on CPFF contracts against receivables in connection with the contracts only when it is expected that the advances will be applied in payment of those particular charges. In any case, amounts offset should be clearly disclosed.

**Section B --**
**Renegotiation**

1. This section
[fn1] deals with certain aspects of the accounting
for those government contracts and subcontracts which are subject
to renegotiation.

[fn1] The comments in this section are
considered to be applicable also to price redetermination
estimated to result in retroactive price reduction.

2. Where such contracts constitute a substantial part of the business done, the uncertainties resulting from the possibilities of renegotiation are usually such that appropriate indication of their existence should be given in the financial statements.

3. It is impossible to lay down general rules which can be applied satisfactorily in all cases. Here, as elsewhere in accounting, there must be an exercise of judgment which should be based on experience and on a clear understanding of the objective to be attained. That objective is to present the fairest possible financial statements, and at the same time make clear any uncertainties that limit the significance of such statements.

4. In keeping with the established accounting principle that provision should be made in financial statements for all liabilities, including reasonable estimates for liabilities not accurately determinable, provision should be made for probable renegotiation refunds wherever the amount of such refunds can be reasonably estimated. Thus, in cases where experience of the company or of comparable companies with renegotiation determinations is available and would make a reasonable estimate practicable, provision in the income account for an estimated

refund affecting the current year's operations is called for. In cases in which a reasonable estimate cannot be made, as where the effect of a new or amended renegotiation act cannot be foretold within reasonable limits or where a company is facing renegotiation for the first time and no reliable precedent is available, disclosure of the inability, because of these circumstances, to determine renegotiation effects and of the consequent uncertainties in the financial statements is necessary.

5. In addition to any provision made in the accounts, disclosure by footnote or otherwise may be required as to the uncertainties, their significance, and the basis used in determining the amount of the provision, such as the prior years' experience of the contractor or of similar contractors if their experience is available and is used, renegotiation discussions relating to the current year, etc. Such disclosure may be helpful in informing shareholders or other interested persons as to the company's status under the renegotiation law. It should also be recognized that, if conditions change, the results of a prior-year determination or settlement are not, in most cases, indicative of the amount probably refundable for the current year.

**Treatment in Financial Statements**

6. Provisions made for renegotiation refunds should be included in the balance sheet among the current liabilities.

7. Accounting treatment in the income statement should conform to the concept that profit is deemed to be realized when a sale in the ordinary course of business is effected, unless the circumstances are such that collection of the sales price is not reasonably assured. [fn2] Renegotiation refunds are commonly referred to as involving a refund of "excessive profits"; realistically, however, renegotiation involves an adjustment of the original contract or selling price. Since a provision for renegotiation refund indicates that the collection, or retention, of the selling price is not reasonably assured, the provision should preferably be treated in the income statement as a deduction from sales. Because of the interrelationship of renegotiation and taxes on income, the provision for such taxes should then be computed accordingly.

[fn2] See chapter 1, rule 1.

8. The amount refundable is, however, generally a net amount, i.e., allowances made for any taxes on income which may have been paid or assessed thereon. Therefore, as an alternative to the presentation indicated in the preceding paragraph, the provision for renegotiation refund may be shown as a charge in the income statement, separately from the provision for taxes on income, or in combination therewith.

**Renegotiation Refunds for Prior Years**

9. A further question arises where a renegotiation refund applicable to a particular year is made in an amount materially different from the provision made in the financial statements

originally issued for such year. The committee recommends that
the difference between the renegotiation refund and the provision
therefore be shown as a separate item in the current income
statement, unless such inclusion would result in a distortion
of the current net income, in which event the adjustment should
be treated as an adjustment of earned surplus.
[fn3] Where an
adjustment of earned surplus is made there should be appropriate
disclosure of the effect of the adjustment on the prior year's
net income. The committee believes that a major retroactive
adjustment of the provision made for a renegotiation refund can
often best be disclosed by presenting a revised income statement
for the prior year, either in comparative form in conjunction
with the current year's financial statements
[fn4] or otherwise,
and it urges that this procedure be followed.

   [fn3] See chapter 8, paragraphs 11, 12, and 13.

   [fn4] See chapter 2
(a).


   **Section C  --**
   **Terminated War and Defense Contracts**

   1. This section deals with problems involved in accounting for
   fixed-
price war and defense supply contracts terminated, in whole
   or in part, for the convenience of the government. It does not
   deal specifically with terminated cost-plus-fixed-
fee contracts
   nor with contracts for facilities or services. However, the
   conclusions reached herein may serve as guides for the accounting
   applicable to such special contracts. Terminations for default of
   the contractor involve problems of a different nature and are not
   considered here.

   2. Except where the text clearly indicates otherwise, the term
   *contractor* is used to denote either a prime contractor or a
   subcontractor, and the term *contract* to denote either a prime
   contract or a subcontract.

   **Summary Statement**

   3. The profit of a contractor on a fixed-
price supply contract
   terminated for the convenience of the government accrues as of
   the effective date of termination.

   4. Those parts of the termination claim which are reasonably
   determinable should be included in financial statements after
   termination; when the total of the undeterminable elements is
   believed to be material, full disclosure of the essential facts
   should be made, by footnote or otherwise.

   5. Under ordinary circumstances the termination claim should be
   classified as a current asset and unless the amount is relatively
   small should be separately disclosed.

   6. Advances received on the contract before its termination may

be shown in financial statements after termination as a deduction from the claim receivable and should be appropriately explained. Loans negotiated on the security of the termination claim, however, should be shown as current liabilities.

7. All of the contractor's own cost and profit elements included in the termination claim are preferably accounted for as a sale and if material in amount should be separately disclosed. The costs and expenses chargeable to the claim may then be given their usual classification in the accounts.

8. When inventory items whose costs are included in the termination claim are subsequently reacquired by the contractor the reacquisition value of those items should be recorded as a purchase and applied, together with other disposal credits, against the termination claim receivable.

9. So called *no-cost* settlements --
those in which the
contractor waives the right to make a claim --
result in no
transaction which could be reflected in sales. The costs applicable to the contract may be given their usual classification in the accounts; the inventory retained should not be treated as a purchase but should be accounted for according to the usual methods and standards applicable to inventories.

**Discussion**

10. Termination of war and defense contracts for the convenience of the government is a means of adjusting the production of materials to the varying requirements of the military services. Since terminations transfer active contracts in process of execution into claims in process of liquidation, they, like contract renegotiations and cost-plus-fixed-
fee contracts, may
have important effects on the financial statements of defense contractors.

**When profit accrues**

11. An important problem involved in accounting for the effect of terminations is that of determining the time at which profit earned on the contract should be recognized. This problem is similar to that described in other sections of this chapter on renegotiation and cost-plus-fixed-
fee contracts in that it
involves accrual at a specific date of an element of profit whose original measurement may be difficult and will require informed judgment, and whose final amount may not be determined until some future period.

12. Three dates have been mentioned as dates for the determination of profit from terminated contracts: (a) the effective date of termination; (b) the date of final settlement; and (c) some intermediate date, such as that on which the claim is finally prepared or filed. The effective date of termination is the date at which the contractor acquires the right to receive payment on the terminated portion of the contract. This date is also, of the three, the one most objectively determined.

13. Under the accrual basis of accounting recognition is given to revenues and expenses, to the fullest extent possible, in the period to which they relate. Profit on a contract of sale is ordinarily taken into account upon delivery or performance. However, as stated in section A of this chapter it is a generally accepted accounting procedure to accrue revenues under certain types of contracts, and thereby recognize profits, on the basis of partial performance where the circumstances are such that total profit can be estimated with reasonable accuracy and ultimate realization is reasonably assured. Thus, the accrual of profit under a cost-plus-fixed-fee contract is recognized as the fee becomes billable rather than when it is actually billed. Upon termination of a contract the contractor acquires a claim for fair compensation; the government reserves the option of acquiring any of the inventories for which the contractor makes claim under the terminated contract. Except to effect settlements and to protect and dispose of property, the expenses of which are reimbursable, the contractor need perform no further service under a terminated contract in order to enforce his claim. It follows that any profit arising out of such a contract accrues at the effective date of termination and, if the amount can be reasonably ascertained, should be recorded at that time.

**_Determination of claim_**

14. Practical application of the accrual principle to the accounting for terminated war and defense contracts rests upon the possibility of making a reasonable estimate of the amount of the termination claim before its final determination by settlement. This involves two principal considerations: (1) whether the costs of the contractor can be determined with reasonable accuracy and (2) whether the amount of profit to be realized can be estimated closely enough to justify inclusion in the accounts.

15. The various acts and regulations, including a statement of principles for determining costs and certain termination cost memorandums, describe in general terms the costs and expenses which are to be taken into account in arriving at fair compensation, as well as certain costs which are not allowable, and establish uniform termination policies and procedures.

16. While the total claim, and particularly the profit allowance, is subject to negotiation, the termination articles provide for a formula settlement allowing definite percentages of profit based on costs in the event of the failure of negotiations. This in effect fixes a minimum expectation of profit allowance since the formula percentages have also been recognized by regulation as a basis of negotiating settlement in the event of failure by the parties to agree on any other basis. The same regulations give other guides for estimating a fair profit allowance, which in some cases may be greater than the amount computed by the formula percentages. When the contractor, because of lack of prior negotiation experience or uncertainty as to the application of the principles of these regulations to a particular case, is unable to determine a more appropriate profit allowance, he may accrue the minimum amount determined by the formula percentages.

17. The profit to be included in the accounts of the contractor upon termination is the difference between (a) the amount of his recorded claim and (b) the total of the inventory, deferred and capitalized items, and other costs applicable to the terminated contract as they are currently included in his accounts. This profit may exceed the amount specified as profit in the claim because costs applicable to the terminated portion of the contract may be allowable in the claim even though they may have been properly written off as incurred in prior periods.

18. In some cases it will be impossible to make a reasonable estimate of a termination claim in time for inclusion in the financial statements of the period in which the termination occurs. Effect may then be given in the statements to those parts of the termination claim which are determinable with reasonable certainty and disclosure made, by footnote or otherwise, of the status of the remainder.

19. When the contractor's claim includes items of known controversial nature it should be stated at the amount estimated to be collectible. When a particular termination claim or part thereof is so uncertain in amount that it cannot be reasonably estimated, it is preferable not to give effect to that part of the claim in the financial statements; but if the total of such undeterminable elements is material, the circumstances should be disclosed in statements issued before the removal of the uncertainty. In an extreme case involving undeterminable claims, consideration should be given to delaying the issuance of financial statements until necessary data are available.

***Presentation in financial statements***

20. Termination has the effect of converting an active contract in process into a claim, or, from an accounting standpoint, from inventories and other charges into an account receivable. This receivable arises in the regular course of business; it is part of the working capital; and in view of the provisions made for financial assistance to the contractor during the period of termination, collection in large part may be expected within a relatively short time. The termination claim should therefore be classified as a current asset, unless there is an indication of extended delay, such as serious disagreement pointing to probable litigation, which would exclude it from this classification.

21. Although a claim may be composed of several elements representing reimbursable items of special equipment, deferred charges, inventories, and other items, as well as claims for profit, it is preferable to record the claim in one account. When the total of termination claims is material it should be disclosed separately from other receivables. It is also desirable to segregate claims directly against the government from claims against other contractors where the amounts are significant.

22. To assure adequate financial assistance to contractors, the acts provide in some cases for partial payments and in others for such payments or guaranteed loans from the effective date of termination until final settlement. Partial payments are, of course, to be recorded as reductions of the termination claim receivable. Termination loans, on the other hand, are definite

liabilities to third parties, even though guaranteed in whole or
in part by the government, and accordingly should be shown in the
balance sheet as liabilities, with appropriate cross-
reference to
the related claim or claims. When a terminated contract is one on
which advance payments had previously been received, the
financial statements of the contractor issued before final
collection of the claim ordinarily should reflect any balance of
those advances disclosed as deductions from the claim
receivable.
[fn1] Financial statements issued before the
termination claim is recorded should disclose, by footnote or
otherwise, the relationship of such liabilities to a possible
termination claim receivable.

  [fn1] See chapter 11
(a), paragraph 22.

23. Ordinarily, a termination will result in the cessation of a
contractor's activity through which materials or services have
been supplied under the contract and of the related transactions
which have been reflected in the contractor's income accounts as
sales and cost elements. In effect, termination policies and
procedures provide a basis upon which the contractor's costs in
process may become the elements of a final sale under the
terminated portion of the contract. Accordingly, the amount of
the contractor's termination claim representing his cost and
profit elements should be treated as a sale and the costs and
expenses chargeable to the claim given their usual classification
in the income statement. Because these termination sales are of a
special type, their financial results should not be appraised in
the same manner as are those of regular sales and they should, if
material in amount, be separately disclosed in the income
statement. Any items which the contractor chooses to retain
without claim for cost or loss are, of course, not sold but
remain as inventory or deferred charges in the contractor's
accounts.

**Claims of subcontractors**

24. The term *subcontractor's claims* as used in connection with
terminated contracts refers to those obligations of a contractor
to a subcontractor which arise from the subcontractor's costs
incurred through transactions which were related to the contract
terminated but did not result in the transfer of billable
materials or services to the contractor before termination. Other
obligations of a contractor to a subcontractor, arising through
transactions by which materials or services of the subcontractor
are furnished or supplied to the contractor, are considered to be
liabilities incurred in the ordinary course of business and are
not included in the term *claims of subcontractors*.

25. The termination articles provide that, following the
termination of a contract, the contractor shall settle, with the
approval or ratification of the contracting officer when
necessary, all claims of subcontractors arising out of the
termination; and that the contractor shall be paid, as part of
his settlement, the cost of settling and paying claims arising
out of the stoppage of work under subcontracts affected by the
termination. While a contractor ordinarily is liable to his

subcontractors or suppliers for such obligations, the amounts due them are an element in his termination claim and often are not paid to them until after his claim has been settled. He often has no control over the filing of subcontractors' claims and may not know their amount until some time after the termination date or even until some time after he has filed and received payment for his own claim.

26. The possibility that a contractor may suffer loss through failure to recover the amount of his liability on subcontractors' claims arises principally from overcommitments, errors in ordering, and similar causes. Provision should be made in his accounts for losses of this character which are known or believed to be probable.

27. Although the principle that liabilities may not be offset against assets in the financial statements is generally approved by accountants, there is no general agreement as to the accounting treatment to be accorded subcontractors' claims which are expected to be fully recoverable. To the extent that a subcontractor's claim is considered to be unrecoverable no difference of opinion exists; the liability should be recorded and provision made for any contemplated loss. The difference of opinion relates to those subcontractors' claims which are deemed to be fully recoverable.

28. Some accountants believe that the effect of the various acts and regulations is to establish a relationship between the claims of subcontractors and the resulting right of the contractor under his own termination claim which differs from an ordinary commercial relationship and justifies their omission from the accounts. Recoverable subcontractors' claims are thus said to be in the nature of contingent liabilities, which are customarily omitted from the accounts except where a loss is expected. Contingent liabilities may be disclosed in the financial statements without recording them as assets and liabilities, and even when they are recorded it is customary accounting practice to show them on the balance sheet as deductions from the related contingent assets so that no effect upon financial ratios and relationships results.

29. Other accountants believe that the nature of an obligation to a subcontractor is that of an ordinary liability, even though it may arise through the termination of a war or defense contract, and that the contractor's termination claim receivable, although related to the subcontractor's claim, is to be accounted for independently as an asset. This group believes that all subcontractors' claims, to the extent that they are reasonably ascertainable, should be recorded in the accounts and displayed in the contractor's balance sheet as current liabilities, and that the amounts recoverable by the contractor should be included in his termination claim receivable. To the extent that the amounts of subcontractors' claims are not reasonably determinable, disclosure by footnote or otherwise in the financial statements is believed to be adequate.

30. Because of the merits and prevalence of these alternative views, the committee expresses no preference for either treatment and considers either to be acceptable.

*Disposal credits*

31. Disposal credits are amounts deducted from the contractor's termination claim receivable by reason of his retention, or sale to outsiders, of some or all of the termination inventory for which claim was made. In the case of items retained, either as scrap or for use by the contractor, the amount of the credit is determined by agreement between the contractor and a representative of the government. The sale of inventory items by the contractor is likewise subject to approval by the government, except as permitted by regulation. Since the amount of the contractor's termination claim, as already indicated, is properly recorded as a sale, any elements included in that claim for items of inventory retained by the contractor are, in effect, reacquired by him and should be treated as purchases at the agreed value. Amounts received for items sold to others with the approval of the government are collections for the account of the government and should be applied in reduction of the claim receivable. Obviously inventories or other items that are retained by the contractor after termination without claim for loss should not be included as an element of the termination claim.

*No-
cost settlements*

32. A contractor whose contract is terminated may prefer to retain the termination inventory for use in other production or for disposal at his own risk. For these or other reasons the contractor may prefer to make no claim against the government or a higher-tier contractor. In the case of such no-
cost settlements
there is no sale of inventory or other items to the government and therefore no occasion to accrue any profit arising out of the termination. The costs otherwise applicable to the contract should be given their usual treatment in the accounts. Items of inventory or other property retained, having been previously recorded, will, of course, require no charge to purchases but should be treated in accordance with the usual procedures applicable to such assets.

**Chapter 12: FOREIGN OPERATIONS AND FOREIGN EXCHANGE**

1. The recommendations made in this chapter apply to United States companies which have branches or subsidiaries operating in foreign countries.

2. Since World War I foreign operations have been influenced to a marked degree by wars, departures from the gold standard, devaluations of currencies, currency restrictions, government regulations, etc.

3. Although comparatively few countries in recent years have had unrestricted currencies and exchanges, it is nevertheless true that many companies have been doing business in foreign countries having varying degrees of restrictions; in some cases they have been carrying on all operations regarded as normal, including the transmission of funds. In view of the difficulties mentioned above, however, the accounting treatment of assets, liabilities, losses, and gains involved in the conduct of foreign business and

to be included or reflected in the financial statements of United
States companies requires careful consideration.

4. A sound procedure for United States companies to follow is to
show earnings from foreign operations in their own accounts only
to the extent that funds have been received in the United States
or unrestricted funds are available for transmission thereto.
Appropriate provision should be made also for known losses.

5. Any foreign earnings reported beyond the amounts received in
the United States should be carefully considered in the light of
all the facts. The amounts should be disclosed if they are
significant, and they should be reserved against to the extent
that their realization in dollars appears to be doubtful.

6. As to assets held abroad, the accounting should take into
consideration the fact that most foreign assets stand in some
degree of jeopardy, so far as ultimate realization by United
States owners is concerned. Under these conditions it is
important that especial care be taken in each case to make full
disclosure in the financial statements of United States companies
of the extent to which they include significant foreign items.

7. Where more than one foreign exchange rate is in effect, care
should be exercised to select the one most clearly realistic and
appropriate in the circumstances.

**Consolidation of Foreign Subsidiaries**

8. In view of the uncertain values and availability of the
assets and net income of foreign subsidiaries subject to controls
and exchange restrictions and the consequent unrealistic
statements of income that may result from the translation of many
foreign currencies into dollars, careful consideration should be
given to the fundamental question of whether it is proper to
consolidate the statements of foreign subsidiaries with the
statements of United States companies. Whether consolidation of
foreign subsidiaries is decided upon or not, adequate disclosure
of foreign operations should be made.

9. The following are among the possible ways of providing
information relating to such foreign subsidiaries:

a. To exclude foreign subsidiaries from consolidation and
   to furnish (1) statements in which only domestic
   subsidiaries are consolidated and (2) as to foreign
   subsidiaries, a summary in suitable form of their assets
   and liabilities, their income and losses for the year,
   and the parent company's equity therein. The total
   amount of investments in foreign subsidiaries should be
   shown separately, and the basis on which the amount was
   arrived at should be stated. If these investments
   include any surplus of foreign subsidiaries and such
   surplus had previously been included in consolidated
   surplus, the amount should be separately shown or
   earmarked in stating the consolidated surplus in the
   statements here suggested. The exclusion of foreign
   subsidiaries from consolidation does not make it
   acceptable practice to include intercompany profits
   which would be eliminated if such subsidiaries were

consolidated.

b. To consolidate domestic and foreign subsidiaries and
   to furnish in addition the summary described in (a)
(2)
   above.

c. To furnish (1) complete consolidated statements and
   also (2) consolidated statements for domestic companies
   only.

d. To consolidate domestic and foreign subsidiaries and
   to furnish in addition parent company statements showing
   the investment in and income from foreign subsidiaries
   separately from those of domestic subsidiaries.

**Losses and Gains on Foreign Exchange**

10. Realized losses or gains on foreign exchange should be
charged against or credited to operations.

11. Provision should be made, ordinarily by a charge against
operations, for declines in translation value of foreign net
current and working assets (unrealized losses). Unrealized gains
should preferably be carried to a suspense account, except to the
extent that they offset prior provision for unrealized losses, in
which case they may be credited to the account previously
charged.

**Translation of Assets, Liabilities, Losses, and Gains**

**Balance Sheet**

12. Fixed assets, permanent investments, and long-
term
   receivables should be translated into dollars at the rates
   prevailing when such assets were acquired or constructed. When
   large items are purchased for United States dollars (or from the
   proceeds of sale of such dollars), the United States dollar cost
   will, of course, be used. If, however, the purchase is made in
   some foreign currency (obtained from earnings or borrowings),
   then the cost of the assets should be the equivalent of the
   amount of foreign currency in United States dollars, at the rate
   of exchange prevailing at the time payment is made. An exception
   to the foregoing general principle might be made where fixed
   assets, permanent investments, or long-
term receivables were
   acquired shortly before a substantial and presumably permanent
   change in the exchange rate with funds obtained in the country
   concerned, in which case it may be appropriate to restate the
   dollar equivalents of such assets to the extent of the change in
   the related debt.

13. In consolidating or combining the accounts, depreciation
should be computed on the amount of fixed assets as expressed in
United States dollars, even though for purposes of local taxation
it may be impossible to show the foreign currency equivalent of
the full amount of depreciation on the foreign statements.

14. Cash, accounts receivables, and other current assets, unless

covered by forward exchange contracts, should be translated at
the rate of exchange prevailing on the date of the balance sheet.

15. Inventory should follow the standard rule of *cost or
market, whichever is lower* in dollars. Where accounts are to be
stated in which the question of foreign exchange enters and the
inventory is not translated at the rate of exchange prevailing on
the date of the balance sheet, as is usually done with current
assets, the burden of proof is on those who wish to follow some
other procedure.

16. There are, however, undoubtedly many cases where the cost or
a portion of the cost of an article was incurred when the foreign
currency was at a substantially higher rate of exchange than
existed on the closing day of the financial period. In many cases
such an asset could not be replaced for the amount in foreign
currency at which it appears in the records of the branch or
subsidiary company. In some cases the replacement price in
foreign currency would undoubtedly have increased since the fall
in exchange, and it would be inequitable to treat *the lower of
cost or market* as a mere translation at the closing rate of the
foreign currency cost price, where the article could now be
replaced only at a much higher amount in foreign currency. Where
the selling price obtainable in dollars, after deducting a
reasonable percentage to cover selling and other local expenses,
exceeds the cost of the article in dollars at the rate prevailing
as of the date of purchase, such original dollar equivalent may
be considered as the cost for purposes of inventory.

17. Current liabilities payable in foreign currency should be
translated into dollars at the rate of exchange in force on the
date of the balance sheet.

18. Long-
term liabilities and capital stock stated in foreign
  currency should not be translated at the closing rate, but at the
  rates of exchange prevailing when they were originally incurred
  or issued. This is a general rule, but an exception may exist in
  respect to long-
term debt incurred or capital stock issued in
  connection with the acquisition of fixed assets, permanent
  investments, or long-
term receivables a short time before a
  substantial and presumably permanent change in the exchange rate.
  In such instances it may be appropriate to state the long-
term
  debt or the capital stock at the new rate and proper to deal with
  the exchange differences as an adjustment of the cost of the
  assets acquired.

**Profit and Loss Statement**

19. The operating statements of foreign branches or
subsidiaries, or of domestic corporations conducting their
business in foreign currencies (buying, selling, and
manufacturing), should preferably, where there have been wide
fluctuations in exchange, be translated at the average rate of
exchange applicable to each month or, if this procedure would
involve too much labor, on the basis of a carefully weighted
average.

20. Where a major change in an exchange rate takes place during
a fiscal year, there may be situations in which more realistic
results will be obtained if income computed in foreign currencies
is translated for the entire fiscal year at the new rates in
effect after such major fluctuation. This procedure would have
the practical advantage of making unnecessary a cutoff at the
date of the change in the exchange rate. Where dividends have
been paid prior to a major change in the exchange rate, out of
earnings of the current fiscal year, that portion of the income
for the year should be considered as having been earned at the
rate at which such dividend was paid irrespective of the rates
used in translating the remainder of the earnings.

21. While the possibility of losses from currency devaluation
may ordinarily be considered to be a risk inherent in the conduct
of business in foreign countries, the world-
wide scope and
unprecedented magnitude of devaluations that have occurred in
recent years are such that they cannot be regarded as recurrent
hazards of business. Accordingly, exchange adjustments arising
from such extraordinary developments, if so material in amount
that their inclusion in the income statement would impair the
significance of net income to an extent that misleading
inferences might be drawn therefrom, appear to be of such nature
that they might appropriately be charged to surplus.

* * * * * *

22. The foregoing is no more than a brief résumé of the
generally accepted principles pertaining to the treatment of
foreign exchange as applied to the statements of accounts of
American corporations. The practical problems which arise in
their application should receive careful consideration in each
case.

   *Two members of the committee, Messrs, Lindquist and
Mason, assented with qualification to adoption of
chapter 12.*

   Mr. Lindquist believes that the accounting indicated in
paragraph 11 for unrealized losses and gains arising
from exchange fluctuations should be consistent for
losses and gains to the extent that they result from
normal temporary fluctuations in exchange rates.

   Mr. Mason does not approve the inconsistent treatment of
unrealized losses and unrealized gains from exchange
fluctuations. He would prefer to defer them both. He
also believes that long-term receivables and long-
term
liabilities should be translated at current rates.

**Chapter 13: COMPENSATION**

**Section A  --**
**Pension Plans: Annuity Costs Based on Past Service**

1. This section deals with the accounting treatment of costs
arising out of past service which are incurred under pension

plans involving payments to outside agencies such as insurance
companies and trustees. Self-
administered and informal plans
    which do not require payments to outside agencies are not dealt
    with because of their special features and lack of uniformity.
    The principles set forth herein, however, are generally
    applicable to those plans as well.

    2. Charges with respect to pension costs based on past service
    have sometimes been made to surplus on the ground that such
    payments are indirectly compensation for services and that since
    the services upon which computation of the payments is based were
    performed in the past, the compensation should not be permitted
    to affect any period or periods other than those in which the
    services involved were performed. In other cases all annuity
    costs based on past service have been charged to income in the
    period of the plan's inauguration as a current cost of
    originating the plan. In still other cases the position has been
    taken that a pension plan cannot bring the hoped-
for benefits in
    the future unless past as well as future services are given
    recognition and, accordingly, annuity costs based on past service
    have been spread over a period of present and future years. The
    last method is the one permitted under provisions of the Internal
    Revenue Code.
[fn1]

    [fn1] See IRC Sec. 23(p)(1)
(A).

    3. The committee believes that, even though the calculation is
    based on past service, costs of annuities based on such service
    are incurred in contemplation of present and future services, not
    necessarily of the individual affected but of the organization as
    a whole, and therefore should be charged to the present and
    future periods benefited. This belief is based on the assumption
    that although the benefits to a company flowing from pension
    plans are intangible, they are nevertheless real. The element of
    past service is one of the important considerations in
    establishing pension plans, and annuity costs measured by such
    past service contribute to the benefits gained by the adoption of
    a plan. It is usually expected that such benefits will include
    better employee morale, the removal of superannuated employees
    from the payroll, and the attraction and retention of more
    desirable personnel, all of which should result in improved
    operations.

    4. The committee, accordingly, is of the opinion that:

    a. Costs of annuities based on past service should be
       allocated to current and future periods; however, if
       they are not sufficiently material in amount to distort
       the results of operations in a single period, they may
       be absorbed in the current year;

    b. Costs of annuities based on past service should not be
       charged to surplus.

    5. This opinion is not to be interpreted as requiring that
    charges be made to income rather than to reserves previously

provided, or that recognition be given in the accounts of current or future periods to pension costs written off prior to the issuance of an opinion on this subject.

**Section B  --**
**Compensation Involved in Stock Option and Stock**
**Purchase Plans**

1. The practice of granting to officers and other employees options to purchase or rights to subscribe for shares of a corporation's capital stock has been followed by a considerable number of corporations over a period of many years. To the extent that such options and rights involve a measurable amount of compensation, this cost of services received should be accounted for as such. The amount of compensation involved may be substantial and omission of such costs from the corporation's accounting may result in overstatement of net income to a significant degree. Accordingly, consideration is given herein to the accounting treatment of compensation represented by stock options or purchase rights granted to officers and other employees.
[fn1]

[fn1] Bulletin 37, "Accounting for Compensation in the Form of Stock Options," was issued in November, 1948. Issuance of a revised bulletin in 1953 and its expansion to include stock purchase plans were prompted by the very considerable increase in the use of certain types of option and purchase plans following the enactment in 1950 of Section 130A of the Internal Revenue Code. This section granted specialized tax treatment to employee stock options if certain requirements were met as to the terms of the option, as to the circumstances under which the option was granted and could be exercised and as to the holding and disposal of the stock acquired thereunder. In general, the effect of Section 130A is to eliminate or minimize the amount of income taxable to the employee as compensation and to deny to the issuing corporation any tax deduction in respect of such restricted options. In 1951, the Federal Salary Stabilization Board issued rules and regulations relating to stock options and purchase rights granted to employees whereby options generally comparable in nature to the restricted stock options specified in Section 130A might be considered for its purposes not to involve compensation, or to involve compensation only in limited amounts.

2. For convenience, this section will discuss primarily the problems of compensation raised by stock option plans. However, the committee feels that substantially the same problems may be encountered in connection with stock purchase plans made available to employees, and the discussion below is applicable to such plans also.

**Rights Involving Compensation**

3. Stock options involving an element of compensation usually arise out of an offer or agreement by an employer corporation to issue shares of its capital stock to one or more officers or

other employees (hereinafter referred to as grantees) at a stated price. The grantees are accorded the right to require issuance of the shares either at a specified time or during some determinable period. In some cases the grantee's options are exercisable only if at the time of exercise certain conditions exist, such as that the grantee is then or until a specified date has been an employee. In other cases, the grantees may have undertaken certain obligations, such as to remain in the employment of the corporation for at least a specified period, or to take the shares only for investment purposes and not for resale.

**Rights Not Involving Compensation**

4. Stock option plans in many cases may be intended not primarily as a special form of compensation but rather as an important means of raising capital, or as an inducement to obtain greater or more widespread ownership of the corporation's stock among its officers and other employees. In general, the terms under which such options are granted, including any conditions as to exercise of the options or disposal of the stock acquired, are the most significant evidence ordinarily available as to the nature and purpose of a particular stock option or stock option plan. In practice, it is often apparent that a particular option or plan involves elements of two or more of the above purposes. Where the inducements are not larger per share than would reasonably be required in an offer of shares to all shareholders for the purpose of raising an equivalent amount of capital, no compensation need be presumed to be involved.

5. Stock purchase plans also are frequently an integral part of a corporation's program to secure equity capital or to obtain widespread ownership among employees, or both. In such cases, no element of compensation need be considered to be present if the purchase price is not lower than is reasonably required to interest employees generally or to secure the contemplated funds.

**Time of Measurement of Compensation**

6. In the case of stock options involving compensation, the principal problem is the measurement of the compensation. This problem involves selection of the date as of which measurement of any element of compensation is to be made and the manner of measurement. The date as of which measurement is made is of critical importance since the fair value of the shares under option may vary materially in the often extended period during which the option is outstanding. There may be at least six dates to be considered for this purpose: (a) the date of the adoption of an option plan, (b) the date on which an option is granted to a specific individual, (c) the date on which the grantee has performed any conditions precedent to exercise of the option, (d) the date on which the grantee may first exercise the option, (e) the date on which the option is exercised by the grantee, and (f) the date on which the grantee disposes of the stock acquired.

7. Of the six dates mentioned two are not relevant to the question considered in this bulletin  --
cost to the corporation
which is granting the option. The date of adoption of an option plan clearly has no relevance, inasmuch as the plan per se constitutes no more than a proposed course of action which is

ineffective until options are granted thereunder. The date on which a grantee disposes of the shares acquired under an option is equally immaterial since this date will depend on the desires of the individual as a shareholder and bears no necessary relation to the services performed.
[fn2]

[fn2] This was the date on which income or gain taxable to the grantee may arise under Section 130A. Use of this date for tax purposes is doubtless based on considerations as to the ability of the optionee to pay taxes prior to sale of the shares.

8. The date on which the option is exercised has been advocated as the date on which a cost may be said to have been incurred. Use of this date is supported by the argument that only then will it be known whether or not the option will be exercised. However, beginning with the time at which the grantee may first exercise the option he is in effect speculating for his own account. His delay has no discernible relation to his status as an employee but reflects only his judgment as an investor.

9. The date on which the grantee may first exercise the option will generally coincide with, but in some cases may follow, the date on which the grantee will have performed any conditions precedent to exercise of the option. Accordingly this date presents no special problems differing from those to be discussed in the next paragraph.

10. There remain to be considered the date on which an option is granted to a specific individual and the date on which the grantee has fulfilled any conditions precedent to exercise of the option. When compensation is paid in a form other than cash the *amount* of compensation is ordinarily determined by the fair value of the property which was agreed to be given in exchange for the services to be rendered. The time at which such fair value is to be determined may be subject to some difference of opinion but it appears that the date on which an option is granted to a specific individual would be the appropriate point at which to evaluate the cost to the employer, since it was the value at that date which the employer may be presumed to have had in mind. In most of the cases under discussion, moreover, the only important contingency involved is the continuance of the grantee in the employment of the corporation, a matter very largely within the control of the grantee and usually the main objective of the grantor. Under such circumstances it may be assumed that if the stock option were granted as a part of an employment contract, both parties had in mind a valuation of the option at the date of the contract; and accordingly, value at that date should be used as the amount to be accounted for as compensation. If the option were granted as a form of supplementary compensation otherwise than as an integral part of an employment contract, the grantor is nevertheless governed in determining the option price and the number of shares by conditions then existing. It follows that it is the value of the option at that time, rather than the grantee's ultimate gain or loss on the transaction, which for accounting purposes constitutes whatever compensation the grantor intends to pay. The committee therefore concludes that in most cases, including situations where the right to exercise is conditional upon

continued employment, valuation should be made of the option as
of the date of grant.

11. The date of grant also represents the date on which the
corporation foregoes the principal alternative use of the shares
which it places subject to option, i.e., the sale of such shares
at the then prevailing market price. Viewed in this light, the
*cost* of utilizing the shares for purposes of the option plan
can best be measured in relation to what could then have been
obtained through sale of such shares in the open market. However,
the fact that the grantor might, as events turned out, have
obtained at some later date either more or less for the shares in
question than at the date of the grant does not bear upon the
measurement of the compensation which can be said to have been in
contemplation of the parties at the date the option was granted.

**Manner of Measurement**

12. Freely exercisable option rights, even at prices above the
current market price of the shares, have been traded in the
public markets for many years, but there is no such objective
means for measuring the value of an option which is not
transferable and is subject to such other restrictions as are
usually present in options of the nature here under discussion.
Although there is, from the standpoint of the grantee, a value
inherent in a restricted future right to purchase shares at a
price at or even above the fair value of shares at the grant
date, the committee believes it is impracticable to measure any
such value. As to the grantee any positive element may, for
practical purposes, be deemed to be largely or wholly offset by
the negative effect of the restrictions ordinarily present in
options of the type under discussion. From the viewpoint of the
grantor corporation no measurable cost can be said to have been
incurred because it could not at the grant date have realized
more than the *fair value* of the optioned shares, the concept of
fair value as here used encompassing the possibility and prospect
of future developments. On the other hand, it follows in the
opinion of the committee that the value to the grantee and the
related cost to the corporation of a restricted right to purchase
shares at a price *below* the fair value of the shares at the
grant date may for the purposes here under discussion be taken as
the excess of the then fair value of the shares over the option
price.

13. While market quotations of shares are an important and often
a principal factor in determining the fair value of shares,
market quotations at a given date are not necessarily conclusive
evidence.
[fn3] Where significant market quotations cannot be obtained,
other recognized methods of valuation have to be used.
Furthermore, in determining the fair value of shares for the
purpose of measuring the cost incurred by a corporation in the
issuance of an option, it is appropriate to take into
consideration such modifying factors as the range of quotations
over a reasonable period and the fact that the corporation by
selling shares pursuant to an option may avoid some or all of the
expenses otherwise incurred in a sale of shares. The absence of a
ready market, as in the case of shares of closely-
held
corporations, should also be taken into account and may require

the use of other means of arriving at fair value than by reference to an occasional market quotation or sale of the security.

[fn3] Whether treasury or unissued shares are to be used to fulfill the obligation is not material to a determination of value.

**Other Considerations**

14. If the period for which payment for services is being made by the issuance of the stock option is not specifically indicated in the offer or agreement, the value of the option should be apportioned over the period of service for which the payment of the compensation seems appropriate in the existing circumstances. Accrual of the compensation over the period selected should be made by means of charges against the income account. Upon exercise of an option the sum of the cash received and the amount of the charge to income should be accounted for as the consideration received on issuance of the stock.

15. In connection with financial statements, disclosure should be made as to the status of the option or plan at the end of the period of report, including the number of shares under option, the option price, and the number of shares as to which options were exercisable. As to options exercised during the period, disclosure should be made of the number of shares involved and the option price thereof.

Dissent

*One member of the committee, Mr. Mason, assented with qualification to adoption of section B of chapter 13. One member, Mr. Knight, did not vote.*

Mr. Mason assents only under the assumption that if an option lapses after the grantee becomes entitled to exercise it, the related compensation shall be treated as a contribution by the grantee to the capital of the grantor.

**Chapter 14: DISCLOSURE OF LONG-TERM LEASES IN FINANCIAL STATEMENTS OF LESSEES**

1. The growth in recent years of the practice of using long-term leases as a method of financing has created problems of disclosure in financial statements. In buy-build-sell-and-lease transactions, the purchaser of land builds to his own specifications, sells the improved property, and simultaneously leases the property for a period of years. Similar transactions are the sale and lease of existing properties or the lease of properties to be constructed by the lessor to the specifications of the lessee. The lessee ordinarily assumes all the expenses and obligations of ownership (such as taxes, insurance, interest, maintenance, and repairs) except payment of any mortgage indebtedness on the property.

2. There are many variations in such types of transactions. For

example, some leases contain an *option* for acquisition of the
property by the lessee, while other leases contain a
*requirement* that the lessee purchase the property upon
expiration of the lease. In some the price to be paid upon
repurchase is related to the fair value of the property or the
depreciated book value; in others it is an arbitrary amount with
little or no relation to the property's worth, or a nominal sum.
Some leases provide for a high initial rental with declining
payments thereafter or renewal at substantially reduced rentals.

  3. Where long-
term leases are used as a substitute for ownership
  and mortgage borrowing a question arises as to the extent of
  disclosure to be made in financial statements of the fixed annual
  amounts payable and other important terms under such
  leases.
[fn1]

  [fn1] Rule 3-18 (b) of regulation S-
X
  issued by the Securities and Exchange Commission reads: "Where
  the rentals or obligations under long-
term leases are material
  there shall be shown the amounts of annual rentals under such
  leases with some indication of the periods for which they are
  payable, together with any important obligation assumed or
  guarantee made in connection therewith. If the rentals are
  conditional, state the minimum annual amounts."

  4. Although the types of sell-and-
lease arrangements referred to
  in paragraph 1 differ in many respects from the conventional
  long-term lease,
[fn2] the principles of disclosure stated herein
  are intended to apply to both. This chapter does not apply to
  short-term leases
[fn3] or to those customarily used for oil and gas
  properties.

  [fn2] The conventional lease, a straight
  tenure contract between the owner of property and a lessee,
  generally does not involve buying, building, and selling of
  property by the lessee, or special repurchase arrangements.

  [fn3] Three years has been used as a
  criterion in some cases for classifying leases as short-
term or
  long-
term.

  5. The committee believes that material amounts of fixed rental
  and other liabilities maturing in future years under long-
term
  leases and possible related contingencies are material facts
  affecting judgments based on the financial statements of a
  corporation, and that those who rely upon financial statements
  are entitled to know of the existence of such leases and the
  extent of the obligations thereunder, irrespective of whether the
  leases are considered to be advantageous or otherwise.
  Accordingly, where the rentals or other obligations under

long-
term leases are material in the circumstances, the committee
is of the opinion that:

a. disclosure should be made in financial statements or
   in notes thereto of:

   (1) the amounts of annual rentals to be paid under such
       leases with some indication of the periods for which they are
       payable and

   (2) any other important obligation assumed or guarantee made
       in connection therewith;

b. the above information should be given not only in the
   year in which the transaction originates but also as
   long thereafter as the amounts involved are material; and

c. in addition, in the year in which the transaction
   originates, there should be disclosure of the principal
   details of any important sale-and-
lease transaction.

6. A lease arrangement is sometimes, in substance, no more than
an instalment purchase of the property. This may well be the case
when the lease is made subject to purchase of the property for a
nominal sum or for an amount obviously much less than the
prospective fair value of the property; or when the agreement
stipulates that the rental payments may be applied in part as
instalments on the purchase price; or when the rentals obviously
are so out of line with rentals for similar properties as to
negate the representation that the rental payments are for
current use of the property and to create the presumption that
portions of such rentals are partial payments under a purchase
plan.

7. Since the lessee in such cases does not have legal title to
the property and does not necessarily assume any direct mortgage
obligation, it has been argued that any balance sheet which
included the property among the assets and any related
indebtedness among the liabilities would be incorrect. However,
the committee is of the opinion that the facts relating to all
such leases should be carefully considered and that, where it is
clearly evident that the transaction involved is in substance a
purchase, the "leased" property should be included among the
assets of the lessee with suitable accounting for the
corresponding liabilities and for the related charges in the
income statement.

Assent

   One member of the committee, Mr. Lindquist, assented
with qualification to adoption of chapter 14.

   Mr. Lindquist's qualification relates to paragraph 6. He
believes that at any time during a long-
term lease,
other than a reasonable period before its expiration, no
determination is possible as to *prospective fair value*

*of the property* for comparison with the purchase price
that may be stated in the lease. He also questions the
ability of an accountant to carry out the implicit
requirement for comparison of the lease rental with
*rentals for similar properties* in view of the many
physical and other factors on which would rest a
conclusion of similarity of properties.

## Chapter 15: UNAMORTIZED DISCOUNT, ISSUE COST, AND REDEMPTION PREMIUM ON BONDS REFUNDED

1. Until the early days of the century, bond discount was
commonly regarded as a capital charge. When the unsoundness of
this treatment was recognized, alternative methods of treatment
became accepted, under one of which the discount was distributed
over the term of the issue, and under the other the discount was
charged immediately against surplus, the latter being regarded
generally as the preferable course.

2. Present-
day treatment recognizes that on an issue of bonds
the amount agreed to be paid (whether nominally as interest or as
principal) in excess of the net proceeds constitutes the
compensation paid for the use of the money. Where bonds are
issued at a discount it is customary to distribute the discount
over the term of the bond issue and to charge both the coupon
interest and the allocated discount directly to income.

3. In the committee's opinion it is a sound accounting procedure
to treat such discount as a part of the cost of borrowed money to
be distributed systematically over the term of the issue and
charged in successive annual income accounts of the company. The
anticipation of this income charge by a debit to income of a
previous year or to surplus has in principle no more
justification than would a corresponding treatment of coupons due
in future years.

4. The argument advanced in favor of immediately writing off
discount was that it extinguished an asset that was only nominal
in character and that it resulted in a conservative balance
sheet. The weight attached to this argument has steadily
diminished, and increasing weight has been given to the arguments
that all such charges should be reflected under the proper head
in the income account, and that conservatism in the balance sheet
is of dubious value if attained at the expense of a lack of
conservatism in the income account, which is far more
significant.

## Treatment of Unamortized Discount, Issue Cost, and Redemption Premium on Bonds Refunded

5. Discussion of the treatment of unamortized discount, issue
cost, and redemption premium on bonds refunded (hereinafter
referred to as unamortized discount) has revolved mainly about
three methods of disposing of the unamortized balance:

  a. A direct write-
off to income or earned surplus,

  b. Amortization over the remainder of the original life

of the issue retired, or

c. Amortization over the life of the new issue.

Each of these methods has had support in court decisions, in determinations by regulatory agencies, and in accounting literature. The reasoning and conclusions reached by the committee in regard to them are given here.

**Direct Write-off**

6. It is acceptable accounting to write off unamortized discount in full in the year of refunding. This treatment is based on the view that the unamortized bond discount represents in effect the cost of the privilege of terminating a borrowing contract which has become disadvantageous and hence comes under the accounting doctrine that a loss or expense should be recognized as such not later than the time when the series of transactions giving rise to it is completed.

7. The decision as to whether a direct write-off of unamortized bond discount is to be made by a charge to income or to earned surplus should be governed by the criteria set forth in chapter 8, paragraphs 11, 12, and 13. Where a write-off is made to earned surplus it should be limited to the excess of the unamortized discount over the reduction of current taxes to which the refunding gives rise. [fn1]

[fn1] See chapter 10B, paragraph 10.

**Amortization over Remainder of Original Life of Retired Issue**

8. The second alternative, distributing the charge over the remainder of the original life of the bonds refunded, has strong support in accounting theory. Its chief merit lies in the fact that it results in reflection of the refinancing expense as a direct charge under the appropriate head in a series of income accounts related to the term of the original borrowing contract.

9. This method is based on the accounting doctrine that when a cost is incurred the benefits of which may reasonably be expected to be realized over a period in the future, it should be charged against income over such period. In behalf of this method, it is argued that the unamortized bond discount represents the cost of making a more advantageous arrangement for the unexpired term of the old agreement. In other words, such discount is regarded as the cost of an option included in the borrowing contract to enable a corporation to anticipate the maturity of its obligations if it finds it possible to refund them at a lower cost, either as the result of a favorable change in interest rates or as the result of its own improved credit. Continuing this line of reasoning, it is argued that the cost of money over the entire period of the original issue is affected by the terms of the original contract, and that if the cost of anticipating maturity is incurred, it is only because it is advantageous to do so; if the saving over the unexpired term of the old bonds will

exceed the amount of unamortized discount to be disposed of, such
discount should properly be spread over that unexpired term as a
proper element of the cost of borrowed money.

10. This method should be regarded as preferable. It conforms
more closely than any other method to current accounting opinion.

11. Where this method is adopted a portion of the unamortized
discount equal to the reduction in current income tax resulting
from the refunding should be deducted in the income statement and
the remainder should be apportioned over the future
period.
[fn2]

[fn2] See chapter 10B, paragraph 12.

**Amortization over Life of New Issue**

12. The third alternative, amortization over the life of the new
issue, runs counter to generally accepted accounting principles.
It cannot be justified on the ground that cost may be spread over
the period during which the benefit therefrom may be presumed to
accrue. Clearly discernible benefits from a refunding accrue only
for the period during which the new issue is replacing the
previously outstanding issue. To determine whether any benefit
will accrue to an issuing corporation for the period during which
the new issue is to be outstanding after the maturity date of the
old issue would require an ability to foresee interest rates to
be in effect during that period. Since such foresight is plainly
impossible, there is no ground for assuming a benefit will result
during that period. Moreover, the method does not possess any
marked practical advantages in comparison with the second
alternative. On the contrary, it results in an understatement of
the annual cost of money after refunding and during the remainder
of the term of the old issue, and consequently might tend to
encourage consummation of transactions which are not, when
properly viewed, advantageous. Furthermore, not only is there a
lack of logical relationship between the amount of unamortized
discount on the *old* issue and the term of the *new* issue, but
also it is unconservative from both the balance-
sheet and the
income standpoints to carry forward part of the unamortized
discount over the longer period. The committee considers the
argument that the expense of retiring the old issue is a part of
the cost of the new transaction to be untenable. In view of the
above considerations the committee's conclusion is that this
method is not acceptable.

**Other Considerations**

13. If the unamortized discount is carried forward after
refunding it is acceptable to accelerate the amortization over a
shorter period than that mentioned in paragraph 9, as long as the
charge is made against income and is not in any year so large as
seriously to distort the income figure for that year. Such
acceleration may be regarded as a middle course between two
alternatives (immediate writing off and spreading over the life
of the old issue), each of which is acceptable, and, therefore,
as being itself acceptable.

14. If the debt is to be paid off through a new issue with a term less than the remaining life of the old issue the amortization should be completed over the shorter period.

15. The method employed should be clearly disclosed, and if the unamortized discount is carried forward the amount of the annual charge should, if significant in amount, be shown separately from other charges for amortization of bond discount and expense.

16. The committee does not regard the charging of unamortized bond discount to capital surplus as an acceptable accounting treatment.

17. If the debt is discharged -- otherwise than by refunding -- before the original maturity date of the issue, any balance of discount and other issue cost then remaining on the books, and any redemption premium, should be written off at the date of such retirement by a charge against income, unless the amount is relatively so large as to fall within the provisions of chapter 8, paragraphs 11, 12, and 13.

*Four members of the committee Messrs. Peoples, Queenan, Werntz, and Williams, assented with qualification, and one member, Mr. Mason, dissented to adoption of chapter 15.*

Messrs. Peoples, Queenan, Werntz, and Williams do not agree with the conclusions expressed in paragraph 12. They believe there are circumstances in which the unamortized discount and redemption premium applicable to an issue being refunded can properly be considered as a cost of the opportunity of issuing new bonds under more favorable terms. They believe there is support to be found in accounting theory and practice for this view. They further believe that it is inappropriate to disapprove this particular treatment and at the same time to approve the wide variety of treatments permitted by paragraphs 6 through 11, and paragraph 13.

Mr. Mason dissents since he believes that, with the exception of a public utility where an equitable result under regulatory procedures may call for the second alternative, the items under discussion should be a direct write-off to income or earned surplus, where lower interest rates have led to the refunding operation. If the refunding takes place in order to extend present interest rates in anticipation of higher rates in the future, the probable benefits would, in his opinion, justify spreading the costs over the life of the new issue.

**Appendix A: LIST OF ACCOUNTING RESEARCH BULLETINS WITH CROSS-REFERENCES**

The following is a chronological list of Accounting Research Bulletins 1 through 42, which are now superseded. It indicates the chapter of the restatement containing each former bulletin,

or portion thereof, as revised.

| No. | Date Issued | Title | Restatement Chapter Number |
|---|---|---|---|
| 1 | Sept., 1939 | General Introduction and Rules Formerly Adopted | Introduction and Chap. 1 |
| 2 | Sept., 1939 | Unamortized Discount and Redemption Premium on Bonds Refunded | 15 |
| 3 | Sept., 1939 | Quasi-Reorganization or Corporate Readjustment - Amplification of Institute Rule No. 2 of 1934 | 7A |
| 4 | Dec., 1939 | Foreign Operations and Foreign Exchange | 12 |
| 5 | April, 1940 | Depreciation on Appreciation | 9B |
| 6 | April, 1940 | Comparative Statements | 2A |
| 7 | Nov., 1940 | Reports of Committee on Terminology | [fn*] |
| 8 | Feb., 1941 | Combined Statement of Income and Earned Surplus | 2B |
| 9 | May, 1941 | Report of Committee on Terminology | [fn*] |
| 10 | June, 1941 | Real and Personal Property Taxes | 10A |
| 11 | Sept., 1941 | Corporate Accounting for Ordinary Stock Dividends | 7B |
| 12 | Sept., 1941 | Report of Committee on Terminology | [fn*] |
| 13 | Jan., 1942 | Accounting for Special Reserves Arising out of the War | [fn**] |
| 14 | Jan., 1942 | Accounting for United States Treasury Tax Notes | 3B |
| 15 | Sept., 1942 | The Renegotiation of War Contracts | 11B |
| 16 | Oct., 1942 | Report of Committee on Terminology | [fn*] |
| 17 | Dec., 1942 | Post-War Refund of Excess-Profits Tax | [fn**] |
| 18 | Dec., 1942 | Unamortized Discount and Redemption Premium on Bonds Refunded (Supplement) | 15 |
| 19 | Dec., 1942 | Accounting under Cost-Plus-Fixed Fee Contracts | 11A |
| 20 | Nov., 1943 | Report of Committee on Terminology | [fn*] |
| 21 | Dec., 1943 | Renegotiation of War Contracts (Supplement) | |
| 22 | May, 1944 | Report of Committee on Terminology | [fn*] |
| 23 | Dec., 1944 | Accounting for Income Taxes | 10B |
| 24 | Dec., 1944 | Accounting for Intangible Assets | 5 |
| 25 | April, 1945 | Accounting for Terminated War Contracts | 11C |
| 26 | Oct., 1946 | Accounting for the Use of Special War Reserves | [fn**] |
| 27 | Nov., 1946 | Emergency Facilities | 9C |
| 28 | July, 1947 | Accounting Treatment of General Purpose Contingency Reserves | 6 |
| 29 | July, 1947 | Inventory Pricing | 4 |
| 30 | Aug., 1947 | Current Assets and Current Liabilities: Working Capital | 3A |
| 31 | Oct., 1947 | Inventory Reserves | 6 |
| 32 | Dec., 1947 | Income and Earned Surplus | 8 |
| 33 | Dec., 1947 | Depreciation and High Costs | 9A |
| 34 | Oct., 1948 | Recommendation of Committee on Terminology - Use of Term "Reserve" | [fn*] |
| 35 | Oct., 1948 | Presentation of Income and Earned Surplus | 8 |
| 36 | Nov., 1948 | Pension Plans: Accounting for Annuity | |

```
                          Costs Based on Past Services         13A
  37    Nov., 1948    Accounting for Compensation in the Form of
                          Stock Options                         13B
  38    Oct., 1949    Disclosure of Long-
Term Leases in Financial
                          Statements of Lessees                14
  39    Oct., 1949    Recommendation of Subcommittee on
                          Terminology -
  Discontinuance of the Use
                          of the Term "Surplus"                [fn*]
  40    Sept., 1950   Business Combinations                    7C
  41    July, 1951    Presentation of Income and Earned Surplus
                          (Supplement to Bulletin No. 35)       8
  13    July, 1951    Limitation of Scope of Special War       [fn**]
  (Addendum)              Reserves

  26    July, 1951    Limitation of Scope of Special War       [fn**]
  (Addendum)              Reserves

  42    Nov., 1952    Emergency Facilities -
  Depreciation,
                          Amortization, and Income Taxes        9C
  11    Nov., 1952    Accounting for Stock Dividends and Stock  7B
  (Revised)               Split-
ups

  37    Jan., 1953    Accounting for Compensation Involved in

  (Revised)               Stock Option and Stock Purchase Plans 13B
```

[fn*] Terminology bulletins published separately.

[fn**] Withdrawn. See explanation ff. in Appendix C.

**Appendix B: CHANGES OF SUBSTANCE MADE IN THE COURSE OF RESTATING AND REVISING THE BULLETINS**

1. Restatement and revision of the Accounting Research Bulletins involved numerous changes in wording, amounting in some cases to complete rewriting, but most of these changes were made in the interest of clarification, condensation, or elimination of material no longer pertinent. Changes in substance where necessary were made and are set forth below by chapters. Particular attention is called to the comments respecting the application of government securities against liabilities for federal taxes on income, write-offs of intangibles, and the treatment of refunds of income taxes based on the carry-back of losses and unused excess-profits credits.

**Applicability of Bulletins**

2. In Bulletin No. 1 no general comment was made as to the applicability of the committee's pronouncements other than to state that they should not be regarded as applicable to investment trusts. That statement has been omitted. A new statement of applicability appears in the introduction, which

indicates that, in general, the committee's opinions should be
regarded as applicable primarily to business enterprises
organized for profit. The statement reads as follows:

3. "The principal objective of the committee has been to narrow
areas of difference and inconsistency in accounting practices,
and to further the development and recognition of generally
accepted accounting principles, through the issuance of opinions
and recommendations that would serve as criteria for determining
the suitability of accounting practices reflected in financial
statements and representations of commercial and industrial
companies. In this endeavor, the committee has considered the
interpretation and application of such principles as appeared to
it to be pertinent to particular accounting problems. The
committee has not directed its attention to accounting problems
or procedures of religious, charitable, scientific, educational,
and similar non-
profit institutions, municipalities, professional
firms, and the like. Accordingly, except where there is a
specific statement of a different intent by the committee, its
opinions and recommendations are directed primarily to business
enterprises organized for profit."

**Current Assets and Current Liabilities  --
Chapter 3, Section A**

4. A comment has been included under current assets to the
effect that the description of the basis of pricing inventories
should include an indication of the method of determining the
cost  -- e.g., *average cost, first-in first-out, last-in first-
out,*
*etc.*

**Application of United States Government Securities Against Liabilities
for Federal Taxes on Income  --
Chapter 3, Section B**

5. In Bulletin No. 14 the committee expressed approval of the
offsetting of United States Treasury Tax Notes, Tax Series A-
1943
and B-
1943, against liabilities for federal taxes on income in
the balance sheet, provided that at the date of the balance sheet
or of the independent auditor's report there was no evidence of
an intent not to surrender the notes in payment of the taxes.
Government securities having restrictive terms similar to those
contained in the 1943 tax series are no longer issued but certain
other types of government securities have since been issued
which, by their terms, may be surrendered in payment of
liabilities for federal taxes on income. In section B of chapter
3 the committee sanctions the offsetting of these securities
against liabilities for federal taxes on income. It also
expresses the opinion that extension of the practice to include
the offset of other types of United States government securities,
although a deviation from the general rule against offsets, is
not so significant a deviation as to call for an exception in an
accountant's report on the financial statements.

**Intangible Assets  --
Chapter 5**

6. Bulletin No. 24, which was published in 1944, stated the committee's belief that the long accepted practice of eliminating type (b) intangibles (i.e., intangibles with no limited term of existence and as to which there is, at the time of acquisition, no indication of limited life) against any existing surplus, capital or earned, even though the value of the asset was unimpaired, should be discouraged, especially if proposed to be effected by charges to capital surplus.

7. In chapter 5 the committee expresses the opinion that lump-sum write-
offs of type (b) intangibles should in no case be
  charged against capital surplus, should not be made against
  earned surplus immediately after acquisition, and, if not
  amortized systematically, should be carried at cost until an
  event has taken place which indicates a loss or a limitation on
  the useful life of the intangibles.

**Contingency Reserves  --**
 **Chapter 6**

8. In chapter 6 the opinion is expressed that the preferable balance-
sheet treatment of general purpose contingency reserves
  (a subject not specifically covered in Bulletins Nos. 28 and 31)
  is to show them under stockholders' equity.

**Quasi-Reorganization or Corporate Readjustment  --**
 **Chapter 7, Section A**

9. Bulletin No. 3 stated that a readjustment of accounts through quasi-
reorganization calls for the opening of a new earned
  surplus account dating from the effective date of the
  readjustment, but made no reference to the length of time such
  dating should continue. Section A of chapter 7 states that ". . .
  this dating should be disclosed in financial statements until
  such time as the effective date is no longer deemed to possess
  any special significance."

**Business Combinations  --**
 **Chapter 7, Section C**

10. The opinions expressed in Bulletin No. 40 have been
  amplified to indicate that any adjustment of assets or of surplus
  which would be in conformity with generally accepted accounting
  principles in the absence of a combination would be equally
  acceptable if effected in connection with a pooling of interests.

**Income Taxes  --**
 **Chapter 10, Section B**

11. In connection with the presentation of allocated income
  taxes in the income statement, the committee recognizes the
  possibility of disclosure in a footnote or in the body of the
  income statement in special cases when the recommended
  presentation is not considered to be practicable. The revision
  also contains a statement that in some cases the use of a current
  over-

all effective tax rate or, as in the case of deferred
  income, an estimated future tax rate may be appropriate in
  computing the tax effect attributable to a particular
  transaction.

  12. In the old bulletin the committee recommended that where tax
  reductions result from the carry-
forward of losses or unused
  excess-
profits credits, the income statement indicate the results
  of operations without inclusion of such reduction, which
  reduction should be shown as a final item before the amount of
  net income for the period, except that where there is substantial
  reason to believe that misleading inferences might be drawn from
  such inclusion the tax reduction might be credited to surplus.
  Section B of chapter 10 adds an alternative treatment whereby the
  amount of taxes estimated to be actually payable for the year may
  be shown in the income statement, with the amount of the tax
  reduction attributable to the amounts carried forward indicated
  either in a footnote or parenthetically in the body of the income
  statement.

  13. The opinion was expressed in the previous bulletin that
  claims for refunds of income taxes based on the carry-
back of
  losses or unused excess-
profits credits should be credited to
  income, except that under certain circumstances they might be
  credited to surplus. Section B of chapter 10 expresses the
  opinion that they should be carried to income. This may be done
  either by indicating in the income statement for the year the
  results of operations before application of the claim for refund,
  which should then be shown as a final item before the amount of
  net income, or by charging income with the amount of taxes
  estimated to be actually payable for the year and showing the
  amount of the reduction attributable to the carry-
back in a
  footnote or parenthetically in the body of the income statement.

  **Renegotiation of Government Contracts  --**
  **Chapter 11, Section B**

  14. The committee has modified the recommendations made in
  Bulletin No. 21 respecting the methods to be used in disclosing
  the renegotiation status and the provision or lack of provision
  for refund in relation to prior year settlements. It believes
  that individual judgment should determine which cases require
  disclosure of the basis of determining the amount provided. The
  committee has also indicated that the comments in section B of
  chapter 11 are applicable to price redetermination estimated to
  result in retroactive price reduction.

  **Foreign Operations and Foreign Exchange  --**
  **Chapter 12**

  15. In Bulletin No. 4 it was stated that a safe course to follow
  is to take earnings from foreign operations into the accounts of
  United States companies only to the extent that funds have been
  received in the United States. In chapter 12 these words are
  added: "or unrestricted funds are available for transmission

thereto."

16. An exception is noted in chapter 12 to the general rule of translating long-
term liabilities and capital stock stated in
  foreign currency at the rate of exchange prevailing when they
  were originally incurred or issued. The exception relates to
  long-
term debt incurred or stock issued in connection with the
  acquisition of fixed assets, permanent investments, or long-
term
  receivables a short time before a substantial and presumably
  permanent change in the exchange rate. The opinion is expressed
  that in such instances it may be appropriate to state the
  long-
term debt or the capital stock at the new rate and proper to
  deal with the exchange differences as an adjustment of the cost
  of the assets acquired.

17. The revision also takes into consideration the possibility
  that in some situations more realistic results will be obtained
  by translating income for the entire fiscal year at the new rates
  in effect after such major fluctuation. Where dividends have been
  paid prior to a major change in the exchange rate, out of
  earnings of the current fiscal year, that portion of the income
  for the year should be considered as having been earned at the
  rate at which such dividend was paid irrespective of the rates
  used in translating the remainder of the earnings.

18. Consideration is also given to the matter of devaluation
  losses arising from world-
wide readjustment, as to which the
  committee comments that where they are so material that their
  inclusion in the income statement would impair the significance
  of net income to an extent that misleading inferences might be
  drawn therefrom, consideration may appropriately be given to
  charging them to surplus.

19. The three preceding paragraphs relate to changes which, in
  part, give recognition to recommendations made in a statement
  entitled *Accounting Problems Arising from Devaluation of Foreign
  Currencies* issued as a research memorandum in November, 1949.

  **Unamortized Discount, Issue Cost, and Redemption Premium on Bonds Refunded
  --
  Chapter 15**

20. When Bulletin No. 2 was issued the committee considered
  three methods of writing off unamortized discount on refunded
  bonds (including issue cost and redemption premium):

  a. Write-
off by a direct charge to earned surplus in the
      year of refunding;

  b. Amortization over the remainder of the original life
      of the issue retired; or

  c. Amortization over the life of the new issue.

21. Methods (a) and (b) were at that time approved as acceptable practice, with a comment that, with a continuance of the shift in emphasis from the balance sheet to the income account, method (b) might well become the preferred procedure. Method (c) was stated to be unacceptable except where such treatment was authorized or prescribed by a regulatory body to whose jurisdiction the accounting corporation was subject, or had been adopted by the company prior to the publication of Bulletin No. 2.

22. In chapter 15 a write-off in full in the year of refunding is stated to be acceptable. The committee believes, however, that the charge should be to income rather than earned surplus, unless the net income figure would thereby be so distorted as to invite misleading inferences. It further believes that any write-off made to earned surplus should be limited to the excess of the unamortized discount over the reduction of current taxes to which the refunding gives rise.

23. Distribution of the charge, by systematic charges against income, over the remainder of the original life of the bonds refunded (method (b)) is stated in chapter 15 to be the preferred method, conforming more closely than any other to current accounting opinion. When this method is adopted an amount equal to the reduction in current income tax resulting from the refunding should be deducted in the income statement, and the remainder should be apportioned over the future period.

24. Amortization over the life of the new issue, unless it is less than the remaining life of the old issue, is stated to be an unacceptable practice.

**Appendix C: BULLETINS NOT INCLUDED IN THE RESTATEMENT AND REVISION**

1. Accounting Research Bulletins No. 13, *Accounting for Special Reserves Arising out of the War*, and No. 26, *Accounting for the Use of Special War Reserves*, are not included in the restatement. Those bulletins were formally withdrawn by the committee in July, 1951, by the issuance of addenda. At that time the committee commented that, "in the light of subsequent developments of accounting procedures, these bulletins should no longer be relied upon as a basis for the establishment and use of reserves."

2. Bulletin No. 17, *Post-War Refund of Excess-Profits Tax,* is withdrawn because it no longer has applicability under present tax laws.

3. Bulletins Nos. 7, 9, 12, 16, 20, 22, 34, and 39, which were issued as recommendations of the committee on terminology, are being published separately.

**You have reached the end of Part 01. To reach other parts, please use READ.**

© 2005, CCH INCORPORATED. All Rights Reserved. A WoltersKluwer Company

**COMMENTARY, FASB, ARB 43: Restatement and Revision of Accounting Research Bulletins, Part 02 of 02**

© 2005, CCH INCORPORATED. All Rights Reserved. A WoltersKluwer Company

**ARB 43: Restatement and Revision of Accounting Research Bulletins**

**This document is divided into multiple parts. To reach other parts, please use READ. You have reached Part 02**

**This part of the document is intentionally left empty. All content resides in the previous parts.**

© 2005, CCH INCORPORATED. All Rights Reserved. A WoltersKluwer Company